UNITED STATES of America, Petitioner-Plaintiff,

v.

72.35 ACRES OF LAND, MORE OR LESS, IN the TOWN OF BROOKHAVEN, SUFFOLK COUNTY, NEW YORK, and Wading River Properties, Inc., et al., Defendants.

C. P. No. 101.

United States District Court
E. D. New York.

April 16, 1957.

Harry T. Dolan, Sp. Asst. to the Atty. Gen., for petitioner-plaintiff.

Bernard Katzen, New York City, for defendants Louis Hodor, Harry Lerner, Samuel Feldman and Stella Levy, Julius Kahn, New York City, and Frederick I. Levy, New York City, of counsel.

INCH, Chief Judge.

This condemnation action was commenced on November 25, 1955, to acquire the fee and easements hereinafter identified for use by the Government in constructing thereon part of a guided missile installation. The lands involved are all located in the Town of Brookhaven, Suffolk County, New York. On the 26.40-acre fee parcel (A–100) were to be erected three small buildings and control towers to serve the radar instruments used in such a site. The remainder of the lands to be used in this project were already owned by the Government and were located some 3,000 feet to the south. The easements taken were to prevent obstructions in the way of buildings, structures or trees from intruding into the path of the radar beams emanating from the instruments to be located on the fee parcel. These easement tracts are identified as Tracts A–100–E–2; A–100–E–3; A–100–E–4; A–100–E–5, and generally radiate from the fee parcel in an easterly, southerly and westerly direc-

tion. The obstruction easement designated as A–100–E–2 involves an area of 20 acres; A–100–E–3—9.54 acres; A–100–E–4—4.95 acres and A–100–E–5—6.6 acres. The taking also involved two access road and utilities easements in Tract A–100–E–1 and Tract A–102–E, which comprised areas of 2.85 acres and .16 acres, respectively. The fee taking involved 26.4 acres; the obstruction easements involved a total area of 41.09 acres, and the access road and utilities easements involved a total of 3.01 acres.

The land taken in fee and all of the easements, with the exception of Tract A–102–E, consisted of part of a larger parcel of approximately 276 acres of wooded, unimproved land. Tract A–102–E consisting of .16 acres, involved a small segment (75' x 100') of a former right-of-way of the Long Island Railroad Company and now claimed to be owned by the Long Island Lighting Company.

The owners of the larger parcel also owned a 16-acre parcel separated from the larger parcel by lands of the Long Island Lighting Company and abutting Highway 25–A. The Government's taking did not invade the smaller tract and it does not appear that its value is involved or has been impaired by the property taken.

The lands involved in the fee and easements appropriated were generally rough, wooded and marked by sharp grades and comparatively high knolls. The elevation near the northerly boundary of the property was 20' above mean sea level and rises to about an elevation of 216' on the parcel taken in fee. With the exception of Tract A–102–E, the lands involved in the fee and easements appropriated are located in the interior of the large parcel of which they formed a part, about 2,200 feet from the northerly boundary and 1,200 feet from its southerly boundary. No road frontage was taken, although the ownership included approximately 5,000 feet on North Country Road,—a secondary highway. The land involved had never been cultivated, cleared or used for any purpose as far as the evidence disclosed. Much of the land not involved and lying to the south of the taking had been cleared and cultivated in whole or in part in the past: The evidence disclosed that the soil content was of a sand and gravel texture and inferior for the growing of crops.

It was conceded that the best and probably the only use which could be made of this land was for future residential subdivision. There were thousands of acres of land so adaptable in the vicinity and lying to the north and south, which were susceptible and adaptable to such use, when and if the market and demand warrant subdivision and the construction of homes. Apparently in the past and as of the taking date, subdivision and housing developments on neighboring lands were negligible, although a considerable number of parcels had been recently sold in the immediate vicinity to investors or speculators.

■ The obstruction easements taken are unusual and uncommon, due to the peculiar utility which they serve and are apparently identified solely with a guided missile project. Cf. United States v. 29.40 acres, D.C.D.N.J.1955, 131 F.Supp. 84. They are, however, very similar in their character to obstruction easements which have been taken by the Government around airfields and airbases; in fact, the language employed in both types of easements is almost identical. United States v. 4.43 acres, D.C.N.D.Texas 1956, 137 F.Supp. 567; United States v. 48.10 acres, D.C.S.D.N.Y.1956, 144 F.Supp. 258; United States v. 26.07 acres, D.C. E.D.N.Y.1954, 126 F.Supp. 374. For all practical and legal purposes, the same judicial construction should obtain. Regardless of nomenclature such easements impose but one impediment or restriction upon the owner's use of his land and that is to limit the height to which he may construct a building or other structure or permit natural growth to grow. The obvious purpose of the easement is to preserve inviolate the integrity of the airspace defined by a plane or surface above the land, through which radar impulses or beams pass to perform the function required of a guided missile instal-

lation. The height of this plane or surface above the land varies with the contour of the land and the inclination or declination, of the plane described and through which the radar impulses pass. In this case the evidence disclosed that the height of the plane above the land surfaces involved and which the Government seeks to protect against obstruction, ranges from a low point of 25 feet to a maximum of 95 feet. The only point where the elevation reaches 25 feet above ground level is in a small area of the southwest corner of Tract A–100–E–4 and the height of the plane throughout the areas involved is adequate for the normal and prevailing construction of homes or other structures, which it can reasonably be assumed might be erected in the future, or which were permitted by local zoning (Residence "B"– 35 Feet). It must be borne in mind that it is the super-adjacent airspace above the land and not the surface of the land which is restricted by such easements and only to the extent of the impairment or limitation of such use should compensation be required to be paid for such easements. Cf. United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; United States v. 48.10 acres, supra; United States v. 26.07 acres, supra.

While the impairment of the owner's utility of the lands involved in the obstruction easements is not substantial, due to prevailing height limitations of existing zoning and typical construction, nevertheless a property right has been taken and for which compensation must be paid in terms of estimated depreciation in market value attributable to the taking. The extent of the depreciation or damage is, of course, speculative, due to the absence of adequate experience in the market, reflected by sales of land on which such easements have been imposed. Such precedents as we have, however, furnish some guide under comparable situations. United States v. 26.07 acres, supra; United States v. 48.-10 acres, supra.

On Tract A–100–E–1, comprising 2.85 acres, the easement taken involved the Government's right to use the surface of the land, as well as the adjacent airspace, for access road and utilities, but reserving to the owner, rights in common with the Government. Here, of course, the impairment in value is more severe, due to the greater impairment of the owner's use.

As to Tract A–102–E, where an access road and utilities easement is taken and comprising .16 acres, the damage or compensation is nominal, since the land forms a part of a long, narrow strip which served as a right-of-way and would have no other independent utility. This land was claimed to be owned by the Long Island Lighting Company, as successor to the Long Island Railroad Company, and served as a former right-of-way. It has no other conceivable use as an independent ownership. Here the impairment of the owner's use of the land is inconsequential.

As usual in these cases, the opinions of the witnesses are irreconcilable, which is due largely to the conflict of opinions as to the extent of the damage attributable to the easements and the uses which the Government can or proposes to make of the land. The owner's witnesses contended that they did not understand the nature of the easements taken; what rights were taken or the extent of the limitation of the owner's use of this property, nor were they advised or had any knowledge of the contemplated use of the land by the Government. Nevertheless, without adequate knowledge of what was taken or the use to which the land was to be put, they proceeded to appraise these rights, based upon a variety and sequence of assumptions which appear more fanciful than real and without a semblance of factual substantiation. This testimony and the conclusion reached were far from convincing. In general, the taking of the easement was treated as the equivalent of the taking of a fee and depreciating the area not taken from 50% to 100%. A large measure of the damage attributed to the remainder was predicated upon the proximity of the lands taken to the military site to be

created on the land taken and that buyers of residential homesites would not wish to be near a military reservation. The land involved, however, already adjoined a military reservation before the taking and, in fact, had a military reservation as a southerly neighbor for many years. It is also highly significant that the sales of the land in the neighborhood, relied upon by both sides as market value indicators, abutted on or were in close proximity to lands owned by the Government and formerly a part of Camp Upton. It would therefore seem to follow that depreciation, if attributable to such a cause, had already set in when these lands were purchased by the defendants in October 1954.

Severance damage, so-called, may arise in a partial taking case either from damage attributable to the physical characteristics of the remainder, limiting or impairing its future use, or from the nature and character of the use which the Government proposes to or may put the part taken. Boyd v. United States, 8 Cir., 1955, 222 F.2d 493. Claims of this character are frequently asserted but seldom maintained by factual demonstration. The burden of proof rests upon the owners and not upon the Government. Westchester County Park Commission v. United States, 2 Cir., 1944, 143 F.2d 688; United States v. 48.10 acres, supra; United States v. 11 acres, D.C.E.D.N.Y.1945, 61 F.Supp. 373; United States v. 44.00 acres, D.C.E.D.S.C.1954, 121 F.Supp. 862, 873. In the matter under consideration, such claims to compensation represent the dominant area of dispute and, as usual, the factual basis and substantiation of defendant's claims in this regard are absent. During the past fifteen years the Government has acquired many tracts of land on Long Island for military and related purposes. That such acquisitions by the Government and such uses have adversely influenced the demand or market value of adjoining properties or those in the neighborhood has not been demonstrated to the court in this trial, and such contention is at variance with defendant's claims of value of the subject property and others in the vicinity which for many years have adjoined or were in close proximity to a military reservation.

Throughout the trial, defendant's witnesses and attorney contended that they did not understand the nature, extent and character of the taking or the language employed in the complaint and Declaration of Taking as to the easements taken or the use for which the property was being acquired; yet it does not appear that any Answer was filed or motion made since the action was instituted on November 25, 1955, which challenged or sought clarification of the complaint or Declaration of Taking. Nor does it appear that they sought any information, maps, data or technical advice from the acquiring agency of the Government or its attorney. Professing such complete lack of information, they ascribed a wide assortment of meanings to these documents, which present an unsatisfactory basis to support claims to compensation for specific property appropriated. United States v. 29.-40 acres, supra; United States v. 4.43 acres, supra.

A number of sales were referred to by both sides. Most of the sales involved superior and non-comparable properties but afforded an indication of the trend of values which was decidedly upward. The subject lands, with the exception of Tract A–102–E, were purchased by the defendants in October 1954, approximately a year before the taking, but including 16 acres of superior, cleared land to the south, for an overall average price of $550 per acre. Consideration has been given to the increase in value indicated by the evidence between the date of purchase and the date of taking.

It appears from the evidence that the taking of the fee parcel (Tract A–100) may result in some slight interference with unrestricted layout plans of subdivision and development, when and if this

land is ultimately subdivided into home-sites, although it is not believed that this damage is severe, in view of the large area involved and considering the small area taken, which will permit many alternative methods and plans of subdivision. The only testimony offered, concerning such elements of damage, was that by the Government's witness, who estimated damage resulting from this severance to be the sum of $8,000, and confined it to the remaining land lying east and west of the fee parcel, where the area taken in fee came closest to the easterly and southerly boundaries of the remainder.

I am familiar with the nature of the property and the neighborhood as I have lived for a number of years in an adjoining county. At the same time, on April 12, 1957, I personally inspected the property and the neighborhood, and I have given careful consideration to all the evidence presented and the contentions advanced, and I find and determine that the just compensation which should be paid for the rights and interests acquired are as follows:

Controlling Valuation Date: November 28, 1955
(Date of Order for Possession)

| Tract | Area | Estate | Compensation |
|---|---|---|---|
| A–100 | 26.40 acres | Fee—$1,000. per acre) | $26,400.00 |
| A–100–E–1 | 2.85 " | Access Road and Utilities Easement | |
| | | Fee value–$3,135.00 ($1,100. per acre) | |
| | | Depreciation due to easement—75% | 2,351.25 |
| A–100–E–2 | 20.00 acres | Obstruction Easement | |
| | | Fee value–$22,000.–($1,100. per acre) | |
| | | Depreciation due to easement—10% | 2,200.00 |
| A–100–E–3 | 9.54 acres | Obstruction Easement | |
| | | Fee value–$10,494.00–($1,100. per acre) | |
| | | Depreciation due to easement—10% | 1,049.40 |
| A–100–E–4 | 4.95 acres | Obstruction Easement | |
| | | Fee value–$5,445.00–($1,100. per acre) | |
| | | Depreciation due to easement—10% | 544.50 |
| A–100–E–5 | 6.60 acres | Obstruction Easement | |
| | | Fee value–$7,260.00–($1,100. per acre) | |
| | | Depreciation due to easement—10% | 726.00 |
| Severance Damage or Depreciation to Remainder | | | 10,000.00 |
| Total Compensation (Tracts A-100; A-100-E-1; A-100-E-2; A-100-E-3; A-100-E-4; and A-100-E-5, including severance damage) ----------------- | | | $43,271.15 |
| A–102–E | .16 acres | Access Road and Utilities Easement | 100.00 |

Settle Order.