**UNITED STATES of America, Petitioner-Plaintiff,**

v.

**102.93 ACRES OF LAND situate in the TOWN OF HUNTINGTON, SUFFOLK COUNTY, NEW YORK, and Elizabeth V. Fox, et al., Defendants.**

**C. P. 102.**

United States District Court
E. D. New York.

July 30, 1957.

Harry T. Dolan, Sp. Asst. to Atty. Gen., for petitioner-plaintiff.

John M. Lockwood, Huntington, N. Y., for defendants Elizabeth V. Fox and Anna E. Girgan, Cullen & Dykman, Herman J. Meltzer and Augustus W. Wheeler, Brooklyn, N. Y., of counsel.

INCH, Chief Judge.

This action was commenced on January 16, 1956, to acquire for military purposes certain interests in real property located in the Town of Huntington, Suffolk County, New York. This deci-

sion only purports to cover that portion of the lands involved which were designated in the complaint and Declaration of Taking as Tracts A-101; A-101-E-1; E-2, E-3, E-4 and E-5. The interests to be acquired consist of approximately 20.70 acres in fee and easements affecting approximately 29.68 acres. The easements were two types:—one referred to as a "safety easement", affecting approximately 28.80 acres, and the other a so-called "line-of-sight easement", affecting approximately 5.83 acres, and of which area approximately 4.95 acres was also encumbered by the safety easement.

An order for immediate possession, covering the interests to be acquired, was entered on January 16, 1956. Both sides used January 16, 1956 as the date of valuation. The purpose of the acquisition was for use as part of a guided missile installation, commonly referred to as a "Nike" site.

The safety easements, so-called, consisted substantially of the right of the Government to prohibit the erection on the lands affected of houses or structures to be used for "human habitation", and to prevent "gatherings" of more than twenty-five people. The so-called "line-of-sight" easements consisted of the right of the Government to prohibit the erection on the land affected of buildings or structures of any kind or natural growth, over a certain elevation above the land surface. Cf. United States v. 72.35 Acres, D.C.E.D.N.Y.1957, 150 F. Supp. 271. The height limitation averaged about 35 feet above the ground.

The land taken in fee and encumbered by the easements were part of a larger parcel of approximately 133 acres, with frontage of about 4,400 feet on West Neck Road, a main artery of travel in this area, and with frontage of about 1,500 to 1,600 feet on Cold Spring Harbor. The remaining lands not taken or encumbered by easements have a frontage of approximately 3,000 feet on West Neck Road. The land was unimproved and not the subject of any existing or planned subdivision or development at the time the action was commenced. The land was zoned for residential use, with a minimum plot area of 2 acres and with a maximum of 15% of the plot to be used for structures or buildings of all types. The height limitation of residences was 35 feet and other buildings and structures, 50 feet. The land contour divided the original tract into several categories. In the southeasterly part, where the taking occurred, the land was cleared and generally level. The northerly, central and westerly part of the land was generally wooded, with steep slopes extending to within 400 feet of the water. Extending easterly from the waterline for a distance of approximately 400 feet, the land was level with gently rising slopes. The waterfront area, as well as the plateau adjoining the slopes to the east, afforded excellent views of the harbor and desirable sites for homesites of two to ten-acre plots. The land in the area of the taking, however, did not involve any of the waterfront area and did not afford such views and because of its level nature and proximity to the highway, would be less desirable, but far less costly to develop into marketable homesites.

Sales of comparable waterfront parcels now under development in the vicinity had been selling recently for prices ranging from $800 to $1,360 per acre, and covering the period from 1953 to 1956. There were four recent sales of waterfront property, including the property under consideration, in that area within recent times and which afford the most reliable basis for estimating the market value of the subject property before the taking. The land involved, consisting of approximately 133 acres, was purchased by the defendant in January 1953 (sale consummated in June 1953), for $128,782 or approximately $970 per acre. No changes or improvement of this land had occurred after the purchase and before the taking.

On the fee parcel taken in this action, the Government has constructed three small ranch-type buildings, which are not unpleasant in design or appearance.

About 60 personnel of a select class are employed, but none are quartered or take their meals on the premises. The area is not patrolled and the only guard is stationed at the public road entrance. The plot is partially landscaped with lawns and shrubbery and full landscaping has been provided for. There is no practice firing of missiles, and all missiles are located underground. The Town of Lloyd Harbor has recently purchased or voted to purchase an improved parcel adjoining the Government site on the south, for use as an elementary school, and after inquiry and consultation with the Commanding Officer of the base.

There was the usual disparity in the opinion evidence of the real estate appraisers, and in fact, considerable conflict between the defendants' two experts. Baker thought that the land value before the taking should be broken up into segments and that the value of the part affected was the greatest, because of its proximity to the road and the lower development cost involved. The evidence in this case, as well as my personal experience, convinces me that the extent of public highway frontage in development tracts of this zoning plays no significant part in the market value of such land, since purchasers of subdivided plots in this type of zoning prefer privacy and seclusion to public road proximity and usually, interior plots on private roads are more desirable. Griffith, on the other hand, used an overall unit for the entire area, treating each acre as equal. Baker estimated the increase in values in this area between 1953 and 1956 at 150%. Griffith estimated the increase from 1950 to 1956 at 100%. Both estimates appear to oversimplify a problem having many variable factors. The testimony of Baker, particularly as to severance damage, was sharply in conflict and contrast with that given by him as a Government witness in 1952, involving similar estimates of depreciation in a partial taking case for military purposes and in a highclass residential area in the Village of East Hills, Nassau County. In the "Mackay" case,—United States v. 50.34 Acres in the Village of East Hills, D.C., 155 F.Supp. 169, in which Baker testified for the Government, a parcel of 50 acres was taken out of a larger estate of over 400 acres, all zoned for residential use (1-acre and ⅓-acre plots). The Government had constructed on the lands taken a military installation employing 400 to 500 personnel, of which some 300 lived on the site. Some 250 cars passed in and out of the reservation daily and it was entirely enclosed by a security fence, similar to that involved in this action. In that case Baker attributed 15% severance damage to "loss of privacy" for a small strip, approximately 137 feet deep along a part of the perimeter and 210 feet deep on the remainder. Subsequent events, as disclosed by the Government's proof in this action, shows that this land is under intensive development and private estates immediately adjoin the Government security fence. No sales resistance or loss in value to the adjoining plots was indicated. In this action, Baker depreciated the easement areas 90% of their former value and the remainder not involved in the taking 25%. Sufficient time has elapsed and developments undertaken in close proximity to and/or adjoining similar military establishments to demonstrate with factual proof depreciation due to this influence, if such be the fact, and something more than opinion evidence is required to justify awards of substantial compensation on this basis. While estimates of severance damage due to military uses are largely speculative, we must not fix damage or compensation due to this influence entirely upon this basis, Olson v. United States, 1934, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236, and the defendants have failed to present any comparable situations where this factor has appeared to diminish values of adjoining or neighboring lands or retarded development or sales for high-class residential use. Cf. United States v. 72.35 Acres, supra.

As to the safety easements taken, both the defendants' witnesses estimated this damage at 90% of the "before" fee value, based upon erroneous interpretations of the restrictions imposed and generally upon the ultimate conclusion that all uses of the areas encumbered were destroyed, with the exception of "light and air". The Government's witness Smith concluded, and I accept his views as convincing, that with the exception of sites for a home or place of abode (human habitation), which are relatively small in 2-acre or more residential plots, the encumbered land retains all normal uses to the owner as existed before the taking. Thus this land, so encumbered, can be used for barns, garages, stables, swimming pools or other recreational activities, lawns, gardens, poultry houses, greenhouses and an infinite variety of uses common to such estates and for which the greater part of such land is usually used.

 Griffith, testifying for the defendant, appears to have based his conclusions, particularly of damage by the easements and severance, upon the advice and counsel of others who were not called as witnesses. While experts may rely upon and testify as to factual data obtained from others, their opinions should not be used as a basis for the witnesses' conclusions. Griffith failed to inform the court of the particular comparable sales upon which he relied, but seemed to try to discredit sales relied upon by his associate, as involving inferior properties. It was not shown that he had any previous experience in appraisals involving problems similar to those presented here.

 Smith, on the other hand, testifying for the Government, had made previous appraisals involving similar takings and was familiar with developments adjoining other "Nike" sites. His waterfront sales of comparable properties were properly analyzed to conform to facts which he had personally investigated. He used the same waterfront sales as Baker,—(except Baker omitted the sale of the subject property), but analyzed some of them differently in connection with improvements located thereon. On one sale there was an existing private road for a distance of approximately 4,000 feet, which was used for the development layout of plots now being sold and there also was a residence occupied by the buyer. Baker assigned no value to these improvements, although the testimony of Griffith was to the effect that such roads, under existing zoning, would cost $10 per foot to construct. Costs of demolition of existing structures and acquisition of rights-of-way or other development costs should not be added to prices paid for land as a basis of analysis of sales.

 As to the line-of-sight easements, there appears to be no serious impediment to use inflicted by the restrictions imposed, due to the existing zoning restrictions and the conventional height of structures in this area. United States v. 72.35 Acres, supra; United States v. 48.10 Acres, D.C.S.D.N.Y.1956, 144 F.Supp. 258. There is some evidence that a small area of the remainder, consisting of approximately 2.4 acres along the northerly line of the fee taking, and an area of approximately 3.8 acres to the east, have been damaged to some extent as the result of plottage or layout problems of the remainder area. The Government's proof of direct and indirect damage in this case is unusually convincing, and, on the contrary, the opinions of the defendants' witnesses would justify acceptance only if I were to reject the substantial line of proof supplied by the Government and close my eyes to realities, as I have observed them in dealing with these problems over the years. The Court of Appeals for this Circuit in Westchester County Park Commission v. United States, 2 Cir., 1944, 143 F.2d 688, 692, certiorari denied 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583, pointed out that the fixing of just compensation in a condemnation action "often * * * involves, at best, a guess by informed persons. But that guess must have a rational foundation. And the owner of the land must supply the

court with materials for a guess having such a foundation. For on the owner, and not on the United States, rests the burden of establishing the value." In my judgment, the proof submitted by the owner in this case does not fulfill the standard and burden of proof required under the Court of Appeals opinion above cited. "Opinion evidence without any support in the demonstration and physical facts, is not substantial evidence. Opinion evidence is only as good as the facts upon which it is based." State of Washington v. United States, 9 Cir., 1954, 214 F.2d 33, 43, certiorari denied 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679. "Where unwarranted theories of law or assumptions of fact guide the expert and are used as a basis for value by the Court, the evaluation will be set aside and the cause remanded for new findings." United States v. Honolulu Plantation Co., 9 Cir., 1950, 182 F.2d 172, 178, certiorari denied 340 U.S. 820, 71 S.Ct. 51, 95 L.Ed. 602. In my judgment, the Government's estimates of depreciation and severance damage are liberal, and the compensation hereinafter fixed is adequate to cover all types of damage, either direct or indirect, which the owner has suffered as a result of the taking herein.

On July 12, 1957, I personally inspected the property and surrounding neighborhood, as well as the "Nike" installation located thereon, accompanied by attorneys for the Government and the defendants. I also visited and inspected the waterfront properties which have been the subject of recent sales and which were relied upon by both sides as comparable. I found these properties under development and a number of new homes constructed thereon. It was noted that all of the developments utilize private interior roads as the basis of layout of plots. All of the sales involved comparable, if not superior, land to that here involved. I also observed the improved estate recently purchased by the Town of Lloyd Harbor for its elementary school, immediately adjoining the Government military site on the south.

From the evidence and inspection noted, I find and determine that the just compensation which should be paid for the property taken, including severance damage, to be the sum of $59,459, which is computed as follows:

(A) Fee area taken—20.70 acres (A-101)—
 Valued at $1,500. per acre ..................... $31,050.

(B) Line-of-sight and safety easements
 4.95 acres (A-101-E-2)—
 50% depreciation of fee value ($1,500. per acre),
 or $750. per acre ........................... 3,712.

(C) Safety easements and Severance Damage
 23.85 acres (A-101-E-1; E-4)
 19.85 acres—50% depreciation of fee value—
 ($1,500. per acre)—or $750. per acre $14,887.
 4 acres—75% depreciation of fee value—
 ($1,500. per acre) or $1,125. per acre 4,500.
 19,387.

(D) Line-of-Sight easements and Severance Damage
 .88 acres (A-101-E-3; E-5)
 50% depreciation of fee value—($1,500.
 per acre), or $750. per acre ................. 660.

(E) Severance Damage to 6.2 acres of remainder
 50% of fee value—($1,500. per acre)
 or $750. per acre ........................... 4.650.
 Total Just Compensation $59,459.

Settle order.