TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00373-CV






Pat Barber, Appellant



v.



Texas Department of Transportation; Charles W. Heald, P.E., Executive Director of the


Texas Department of Transportation, in his Official Capacity; John P. Campbell,


P.E., Director, Right-Of-Way Division, Texas Department of Transportation,


in his Official Capacity; Bill Hale, P.E., Abilene District Engineer, Texas


Department of Transportation, in his Official Capacity; Alvin


Luedecke, Jr., P.E., Director of Transportation, Planning


and Program, Texas Department of Transportation, in


his Official Capacity; and John Cornyn, Attorney


General of Texas, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT


NO. 98-09717, HONORABLE MARY PEARL WILLIAMS, JUDGE PRESIDING







 Pat Barber filed suit in Travis County District Court seeking a declaratory judgment
that the Texas Highway Beautification Act ("the Texas HBA" or "the Act") was an
unconstitutional infringement on his right to free speech under the federal and state constitutions. 
Barber also sought an injunction prohibiting enforcement of the Act by the Texas Department of
Transportation, various officials within the Department, and the Attorney General of Texas
(collectively "TxDOT"). TxDOT's motion for summary judgment was granted and the trial court
ordered that Barber was permanently enjoined from displaying an outdoor advertising sign on his
private property in Mitchell County, Texas. Furthermore, Barber was ordered to pay court costs
and TxDOT's reasonable attorneys' fees of $1200. Barber appeals. We will reverse and render
judgment regarding the declaratory judgment and injunction. We will reverse and remand
regarding costs and attorneys' fees.


BACKGROUND

 Barber erected a sign on his private property adjoining Interstate 20, near Colorado
City, Texas. The sign read "Just Say NO to Searches" and displayed a phone number. Callers
dialing the number reached an answering machine that played the following two-minute message
about a citizen's constitutional rights regarding searches:


 This recorded information is provided as a public service by Pat Barber's
Law Office in regard to the large number of unreasonable searches being pursued
by state officers on the highway. Officers are relying on people's ignorance of
their right to search.


 Many people are being intimidated; often, when an officer has asked for a
search and is refused, the officer will threaten to obtain a warrant from a judge. 
This threat is a bluff because most of the time the officer doesn't have probable
cause. When an officer threatens to get a warrant and knows he doesn't have
probable cause, he is intimidating the citizen through deception. Most people don't
know that an officer can't get a warrant to search unless he proves to a judge that
probable cause of a criminal offense exists.


 An innocent citizen may have nothing to hide, but has done nothing wrong,
and should know that when an unreasonable search request is refused, the officer
must let him go.


 When an officer has permission to search, the vehicle may be taken apart
and the contents are thrown on the ground so the drug dogs can work.


 I know about one lady traveling in a late model Suburban who was seen
standing by the side of the road trying to hold her hair together in a twenty-mile-per-hour wind while officers threw her possessions on the ground. After the
officers finished the search and left, a local citizen stopped and helped her pick up
her things.


 I am offended by this kind of police behavior, and I feel a duty to inform
citizens about their rights. Just say NO to searches . . . it's your constitutional
right. If you would like to leave a message, please wait for the beep. Good luck
and have a safe trip.



 Although located on his private property, Barber's sign was within the corridor
along Interstate 20 that is regulated by the Act. The area is not commercial or industrial;
therefore, all signs must qualify for an exemption expressly provided by the Act. Barber's sign
did not qualify for any exemption. Furthermore, he did not apply for a license or permit prior
to erecting the sign as required by the Act.

 Barber received a letter from TxDOT stating that his sign violated the Act. The
letter demanded that Barber comply with the Act or remove the sign. Barber filed suit against
TxDOT in Travis County District Court requesting a temporary injunction, declaratory judgment,
and permanent injunction. After a hearing, the district court issued a temporary injunction,
prohibiting TxDOT from enforcing the Act against Barber pending a trial on the merits.

 Both parties filed motions for summary judgment regarding Barber's claim that the
Act was being applied in an unconstitutional manner. After a hearing, the trial court granted
partial summary judgment in favor of TxDOT. Subsequently, there was a hearing on TxDOT's
counterclaim, seeking removal of the sign. The trial court granted summary judgment, again in
favor of TxDOT. Barber was permanently enjoined from displaying the sign and ordered to pay
all costs and TxDOT's reasonable attorneys' fees of $1200. Barber removed the sign and filed
his notice of appeal.


THE TEXAS HIGHWAY BEAUTIFICATION ACT

 This case is about the constitutionality of the Texas HBA. Like similar statutes in
other states, the Texas HBA was enacted in response to the federal Highway Beautification Act
of 1965. See Tex. Transp. Code Ann. § 391.002(a) (West 1999); 23 U.S.C.A. §§ 131, 136
(West 1990 & Supp. 2000). The federal act requires states to control outdoor advertising signs
along interstate and primary highways or suffer a reduction of ten percent in their federal-aid
highway funds. 23 U.S.C.A. § 131(b) (West 1990). The federal HBA specifies the minimum
standards that the states must enforce to avoid the loss of federal monies, but authorizes the states
to enact stricter standards. Id. § 131(k).

 Chapter 391 of the Texas Transportation Code is entitled Highway Beautification
on Interstate and Primary Systems. Tex. Transp. Code Ann. §§ 391.001-.213 (West 1999 &
Supp. 2001). The purposes of the Act are to promote the safety of the traveling public and to
protect the esthetic beauty of the Texas landscape. Id. § 391.002(b)(1), (c)(2) (West 1999). The
Act dictates that it is a misdemeanor to erect any outdoor advertising (1) that is visible from the
interstate, either (1) within 660 feet of the right-of-way; or (2) outside an urban area, more than
660 feet from the right-of-way, if the sign is erected for the purpose of having its message seen
from the interstate. Id. § 391.031(a), (d). It is not an offense to erect the following types of
signs, regardless of their proximity to rights-of-way: directional; pertaining to natural wonders,
or scenic or historic attractions; advertising the sale or lease of the property on which the sign is
located; advertising activities conducted on the property on which the sign is located; for the
protection of life and property; or signs that are historic or artistic landmarks. Id.
§ 391.031(b)(1)-(3), (5), (6). It is not an offense to erect any type of sign within areas of
industrial or commercial land use. Id. § 391.031(b)(4). Temporary signs relating to public
elections and measuring less than fifty square feet are exempt from regulation under the Act. Id.
§ 391.005.

 Prior to erecting any outdoor advertising sign, a person must acquire a license and
a permit from the Texas Transportation Commission. (2) Id. §§ 391.061(a), .067(a). In order to
qualify for a license, the applicant must file an application and surety bond, and pay a fee. Id.
§ 391.062(a). Erecting a sign without a license is a misdemeanor punishable by a fine of $500
to $1000 per day. Id. § 391.061(b). In order to qualify for a permit, the applicant must possess
a license, file an application, and pay a fee. Id. § 391.068(a)(1), (b). Permits are only issued for
advertising that complies with the Act and with Commission rules. Id. §§ 391.068(a)(2), .032(a). 
Erecting a sign without a permit is a misdemeanor punishable by a fine of $500 to $1000 per day. 
Id. § 391.067(b).

 The legislature has declared that outdoor advertising erected in violation of the Act
"endangers the health, safety, welfare, morals, convenience, and enjoyment of the traveling public
and the protection of the public investment in the interstate and primary highway systems" and
is a public nuisance. Id. § 391.034(a). On written notice from TxDOT, the owner of outdoor
advertising that violates the Act has forty-five days to remove it. Id. § 391.034(b). If the owner
does not remove the sign, TxDOT can direct that the attorney general initiate legal action seeking:
(1) an injunction prohibiting maintenance of the sign; (2) an injunction requiring removal of the
sign; (3) all administrative and legal costs incurred to remove the sign; and (4) a civil penalty of
$500 to $1000 per day. Id. §§ 391.034(b), (c), .035(a), (b) (West 1999 & Supp. 2001).


DISCUSSION

A. The Standard of Review

 The material facts of this case are not in dispute. Because the propriety of the
summary judgment is a question of law, we review the trial court's decision de novo. Natividad
v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994). When both sides move for summary
judgment and the trial court grants one motion and denies the other, we review the summary-judgment proof presented by both sides and determine all questions presented. Comm'rs Court
v. Agan, 940 S.W.2d 77, 81 (Tex. 1997). If we find error, we must render the judgment that the
trial court should have rendered. Id.

B. The Issue on Appeal

 The issue in this appeal is whether the state can prohibit Barber from engaging in
purely ideological speech on his own private property. We hold that this prohibition is a violation
of Barber's free speech rights guaranteed by the First Amendment to the United States
Constitution. (3)


C. Property Rights

 The Texas HBA regulates a corridor along federally funded interstate highways. 
In essence, the state is taking a sight easement across private property to ensure open, billboard-free space alongside the interstate. (4) However, Barber does not allege a taking without just
compensation in violation of the Fifth Amendment and the parties cite no cases on this issue. (5) 
Some of the cases cited by the parties concern whether the federal or state statutes provide enough
exemptions to pass muster under a First Amendment free speech analysis. Rappa v. New Castle
County, 18 F.3d 1043, 1047 (3d Cir. 1994); John Donnelly & Sons v. Campbell, 639 F.2d 6, 8-9
(1st Cir. 1980), summarily aff'd, 453 U.S. 916 (1981). Most of the First Amendment cases cited
by the parties are distinguishable in that they do not involve an individual, private-property owner
who is prohibited from engaging in noncommercial, ideological speech on his own property. See
generally City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 43 (1986) (concerning zoning
prohibiting adult movie theaters in residential zones); Metromedia, Inc. v. City of San Diego, 453
U.S. 490, 493 (1981) (concerning billboard companies' challenge to city ordinance); Thornhill
v. Alabama, 310 U.S. 88, 91 (1940) (concerning statute prohibiting all picketing); Ex parte Tucci,
859 S.W.2d 1, 3 (Tex. 1993) (concerning injunction creating speech-free zone around clinics);
Davenport v. Garcia, 834 S.W.2d 4, 6 (Tex. 1992) (concerning gag order restricting lawyers,
guardians ad litem, and clients from discussing civil litigation); but see City of Ladue v. Gilleo,
512 U.S. 43, 45 (1994) (concerning city ordinance effecting total ban on residential signs with
political, religious, or personal messages).

 Property rights are not created by the Constitution, but by independent sources,
such as state law. Delaware v. New York, 507 U.S. 490, 501-02 (1993). In Texas, property
rights are considered "sacred and fundamental." State v. Texas City, 295 S.W.2d 697, 704 (Tex.
Civ. App.-Galveston 1956), aff'd, 303 S.W.2d 780 (Tex. 1957); Ford v. Grand United Order of
Odd Fellows, 50 S.W.2d 856, 859 (Tex. Civ. App.-Beaumont 1932, writ dism'd w.o.j.) ("right
to own and have exclusive dominion over private property is a sacred one"). The ownership of
property is defined not merely as the right to own and possess the chattel or the land, but to use,
enjoy, and dispose of it as one sees fit. Spann v. City of Dallas, 235 S.W. 513, 514 (Tex. 1921);
Gen. Tire & Rubber Co. v. Tex. Pac. Coal & Oil Co., 102 S.W.2d 1086, 1090 (Tex. Civ.
App.-Fort Worth 1937, writ ref'd); Stone v. Kendall, 268 S.W. 759, 761 (Tex. Civ. App.-Waco
1925, no writ). The Texas Supreme Court has elaborated as follows: 


 The substantial value of property lies in its use. If the right of use be
denied, the value of the property is annihilated and ownership is rendered a barren
right. Therefore a law which forbids the use of a certain kind of property, strips
it of an essential attribute and in actual result proscribes its ownership.


 . . . . 


 . . . The right to acquire and own property, and to deal with it and use it
as the owner chooses, so long as the use harms nobody, is a natural right. It does
not owe its origin to constitutions. It existed before them. It is a part of the
citizen's natural liberty-an expression of his freedom, guaranteed as inviolate by
every American Bill of Rights.



Spann, 235 S.W. at 514-15.

 Of course, the rights of private property owners are not absolute. They are subject
to some restrictions, for example, zoning laws. Village of Euclid v. Ambler Realty Co., 272 U.S.
365, 395 (1926); Brehmer v. City of Kerrville, 320 S.W.2d 193, 196 (Tex. Civ. App.-San
Antonio 1959, no writ); City of Lubbock v. Stubbs, 278 S.W.2d 519, 523 (Tex. Civ.
App.-Amarillo 1954, writ ref'd n.r.e.). However, any exercise of the state's police power to
restrict the right to use one's property must bear a reasonable relationship to the public health,
safety, morals, or welfare. Village of Euclid, 272 U.S. at 395; Brehmer, 320 S.W.2d at 196; City
of Lubbock, 278 S.W.2d at 523; City of Texarkana v. Mabry, 94 S.W.2d 871, 874 (Tex. Civ.
App.-Texarkana 1936, writ dism'd w.o.j.). Restrictions on property use that do not bear a
reasonable relationship to the public welfare are arbitrary and unreasonable, and thus
unconstitutional. Village of Euclid, 272 U.S. at 395.

 The Texas HBA restricts the right to use private property. As such, the Act must
bear a reasonable relationship to the public health, safety, morals, or welfare. See id.; Brehmer,
320 S.W.2d at 196; City of Lubbock, 278 S.W.2d at 523; Mabry, 94 S.W.2d at 874.


D. The First Amendment

 The initial step in First Amendment analysis is to determine whether a statute is
content-neutral or content-based. Rappa, 18 F.3d at 1043; see also Boos v. Barry, 485 U.S. 312,
318-19 (1988) (striking content-based statute that prohibited picket signs critical of foreign
governments); Id. at 320 (stating that statutes are content-neutral when justified without reference
to content of regulated speech). This determination is more complex than it may appear. Statutes
that regulate speech based on the direct impact on the audience are content-based. Id. at 321
(striking content-based regulation that was justified only by need to protect dignity of foreign
diplomatic personnel by shielding them from speech critical of their governments). However, a
regulation that prohibits speech by reference to its type, category, or characteristics (in essence,
its content) may be content-neutral if the regulation is aimed only at curbing the secondary effects
of the speech and not at suppression of a particular message. See City of Renton, 475 U.S. at 47. 
For example, in Renton, the city's zoning ordinance prohibited sexually oriented theaters within
1000 feet of residential neighborhoods, churches, parks, or schools. The Supreme Court noted
that although the city's zoning ordinance treated adult movie theaters differently from other kinds
of theaters, the regulation was not aimed at suppressing the content of the films or preventing
psychological damage to viewers. To the contrary, the regulation was predominately aimed at the
prevention of crime, protection of retail trade, maintenance of property values, and preservation
of the quality of residential neighborhoods. Id. at 48. The city ordinance was analyzed as a
content-neutral regulation and upheld. Id. at 55. Whether a regulation is content-based or
content-neutral determines the analytical framework for deciding whether it infringes on First
Amendment free speech rights.

 If a statute is content-based, it is subjected to strict scrutiny. The state is required
"to show that the regulation is necessary to serve a compelling state interest and that it is narrowly
drawn to achieve that end." Boos, 485 U.S. at 321 (citation omitted). If the statute is content-neutral, reasonably regulating the time, place, and manner of permitted speech, it must be
narrowly tailored to serve a significant governmental interest and leave open ample alternative
channels for communication of the information. Rappa, 18 F.3d at 1054.

 The parties have devoted a good deal of their respective arguments to the issue of
whether the Act is content-based or content-neutral. A review of the primary cases they cite
reveals the complexity of this issue.


 1. The United States Supreme Court's Metromedia Opinion

 The City of San Diego prohibited outdoor advertising display signs (1) identifying
a use, facility, or service not located on the premises; (2) identifying a product not produced, sold,
or manufactured on the premises; or (3) directing attention to a product, service, activity, event,
person, institution, or business generally conducted, sold, manufactured, produced, or offered
elsewhere than on the premises where the sign was located. Metromedia, 453 U.S. at 494. The
city ordinance provided exemptions for onsite signs and twelve specific categories of signs. (6) 
Appellants were the owners of billboards located on land that they leased in commercial and
industrial areas. Space on the signs was leased to any interested party and messages changed
frequently. Id. at 496.

 Justice White authored the plurality opinion, in which three justices joined. He
used a bifurcated approach in which he analyzed the ordinance's effect on commercial and
noncommercial speech separately. First, he observed that the regulation permitted signs
advertising commercial goods and services provided onsite, while prohibiting advertising for
goods and services provided offsite. The following factors led to his conclusion that the city's
regulation of commercial signs was constitutional: (1) the prohibition of offsite advertising was
directly related to the city's substantial interests in safety and esthetics; (2) periodically changing
offsite signs might threaten safety and esthetics more than onsite signs, which changed
infrequently; and (3) the city could reasonably conclude that the interests of onsite advertisers
outweighed the city's interests in safety and esthetics, while the interests of offsite advertisers did
not. Id. at 511-12.

 Next, Justice White analyzed the ordinance's effect on noncommercial advertising. 
He determined that noncommercial advertising was prohibited offsite and onsite, unless within
one of the specific exemptions (for example, for sale signs, religious symbols, or commemorative
historical plaques). Id. at 503. Justice White rejected the argument that the ordinance was a
content-neutral regulation of reasonable time, place, and manner, because "[i]t is apparent . . .
that the ordinance distinguishes in several ways between permissible and impermissible signs at
a particular location by reference to their content." Id. at 516. The plurality declared the
ordinance unconstitutional on its face after making the following observation: Although there was
no evidence that noncommercial billboards posed a greater threat to safety or esthetics, the
ordinance prohibited noncommercial billboards in locations where it allowed commercial
billboards. Id. at 513. On this issue, the plurality spoke approvingly of John Donnelly & Sons,
and stated that "[o]ther courts, however, have failed to give adequate weight to the distinction
between commercial and noncommercial speech and to the higher level of protection to be
afforded the latter." Id. at 513 n.18 (citations omitted). Since the city permitted some
noncommercial messages, it had to allow others, because it did not have the authority to choose
the appropriate topics for public discourse. Id. at 514-15. Therefore, the case was remanded to
the California Supreme Court for determination of whether the ordinance could be constitutionally
sustained by limiting its application to commercial speech only. Id. at 521 & n.26.

 Justice Brennan concurred in the judgment, joined by one other justice, but took
issue with the plurality opinion in several regards. First, he asserted that the bifurcated treatment
of commercial and noncommercial speech was analytically flawed and a departure from precedent. 
Id. at 534. Contrary to the plurality's interpretation of the ordinance, Justice Brennan read the
ordinance as a total ban on commercial and noncommercial outdoor advertising, notwithstanding
a few limited exemptions. Id. at 522-23. He concluded that the onsite exemption would allow
noncommercial speech, such as the identification of a political campaign headquarters or a public
interest group. Id. at 535-36. Justice Brennan challenged the plurality view that perhaps the
ordinance could be sustained if applied solely to commercial speech, because that would vest
government officials with the discretion to decide whether proposed speech was commercial or
noncommercial in the first instance. Id. at 536-37.

 The concurrence therefore analyzed the ordinance as a time, place, and manner
regulation under the content-neutral framework. Justice Brennan stated the test thusly: 


In the case of billboards, I would hold that a city may totally ban them if it can
show that a sufficiently substantial governmental interest is directly furthered by
the total ban, and that any more narrowly drawn restriction, i.e., anything less than
a total ban, would promote less well the achievement of that goal.


Id. at 528. For the following reasons, Justice Brennan found that the ordinance failed this test. 
Although traffic safety was a substantial governmental interest, there was no evidence that
billboards impaired traffic safety. Id. The ordinance was not narrowly drawn because it
prohibited some billboards that would not even be visible from the street. Id. at 528-30. Finally,
the city failed to demonstrate that its interest in esthetics in commercial and industrial areas was
sufficiently substantial. Id. at 530.

 Justice Stevens dissented in part. Based on the parties' stipulation that the
ordinance would eliminate all offsite billboard advertising and an absence of evidence that the
ordinance would impact onsite advertising, Justice Stevens stated that the appellants did not have
standing "to assert the purely hypothetical claims of property owners whose onsite advertising is
entirely unaffected by the application of the ordinance." Id. at 544. Rather, he focused on
whether the city could "entirely ban" offsite advertising. Id. at 542. Justice Stevens answered
this question affirmatively after observing that there was no evidence of censorship by the city and
that the overall communications market in San Diego was adequate. Id. at 552. Finally, Justice
Stevens found that the exemptions to the ban were content-neutral. They did not indicate any
attempt by the city to influence or limit public debate on particular issues. Id. at 554 & n.25.

 Chief Justice Burger's dissent stated that it was "not really relevant" whether the
ordinance was a time, place, and manner regulation or a total ban with content-based exemptions. 
Id. at 557. The Court's duty was to determine whether the ordinance was neutral toward the
messages conveyed and whether it left open other adequate means of conveying those messages. 
Id. at 561. The Chief Justice found that the ordinance was not discriminatory toward any
viewpoint or subject, the exemptions were not an attempt at censorship, and application of the
exemptions did not require the exercise of discretion by government officials. Id. at 565-66. 
Finally, the Chief Justice stated that permitting commercial speech where noncommercial speech
was prohibited did not run afoul of the Constitution. To the contrary, it reflected the city's
recognition that it was at liberty to regulate commercial speech in ways that it could not regulate
noncommercial speech. Id. at 568. Because the city could not, constitutionally, evaluate,
classify, and regulate noncommercial speech, it correctly treated all noncommercial speech the
same. Id. at 569.

 In his brief dissent, Justice Rehnquist described the Court's treatment of the
ordinance as "a virtual Tower of Babel." Id. He stated that the governmental interest in esthetics
was sufficient to justify a total prohibition of billboards in any community and the exemptions
within the ordinance did not render it unconstitutional. Id. at 570.


 2. John Donnelly & Sons v. Campbell

 TxDOT cites John Donnelly & Sons, in which the United States Court of Appeals
for the First Circuit reviewed a challenge to the Maine Traveler Information Services Act on First
Amendment grounds. John Donnelly & Sons, 639 F.2d at 6-7. Two billboard companies
appealed after the district court dismissed their suit against the state. The First Circuit found that
the ban on billboards was content-neutral. Id. at 8. Billboards were not banned due to their
content, but because the medium of communication was objectionable. The ten exemptions from
the regulation reflected appropriate governmental interests and did not "change the statute from
a time, place and manner restriction to one impermissibly based on content." Id. at 9. Next, the
court found that the statute was narrowly drawn to advance the state's interests in esthetics and
tourism. Id. at 12. In regard to commercial speech, the court concluded that there were ample
alternative means of communication. Id. at 13-14.

 TxDOT, however, fails to note that following this favorable analysis of the statute, 
the majority ultimately held it unconstitutional because "[t]here is more involved here . . . than
commercial advertising." Id. at 15. The court observed that although the statute contained ten
exemptions, there were none for "signs on important public issues as to which no referendum is
pending." Id. These signs were effectively banned, without ample alternative means of
communication, meaning that the statute impacted more heavily on ideological speech than on
commercial speech, in contravention of the First Amendment. Id. at 15-16. Consequently, the
First Circuit reversed and remanded the case to the trial court for entry of judgment in favor of
the billboard companies. Id. at 16.


 3. Wheeler v. Commissioner of Highways 

 TxDOT also relies on Wheeler, in which the United States Court of Appeals for
the Sixth Circuit upheld Kentucky's version of the Highway Beautification Act as content-neutral
and narrowly tailored to serve substantial state interests. Wheeler v. Comm'r of Highways, 822
F.2d 586, 587 (6th Cir. 1987). In Wheeler, the court found that the statute did not discriminate
against any particular viewpoint, subject or category of speech, but was instead directed at the
secondary effects of billboards. Id. at 590. The court distinguished the Kentucky Billboard Act
from the ordinance challenged in Metromedia. Id. at 593. The Kentucky statute permitted the
advertising of noncommercial, onsite activities, which the Metromedia plurality concluded were
not permitted by the San Diego ordinance. Id. Importantly, the Sixth Circuit approved the state's
determination that "the right to advertise an activity conducted on-site is inherent in the ownership
or lease of property." Id. at 591. Applying this rationale, it would appear that the right to
convey purely ideological speech is also a right inherent in the ownership of property.


 4. Rappa v. New Castle County

 Barber cites Rappa, in which a candidate for the United States House of
Representatives challenged a state statute that permitted authorities to peremptorily remove his
campaign signs. Rappa, 18 F.3d at 1047. The same statute contained exemptions for a variety
of signs, including those advertising the sale or lease of property and onsite activities. The United
States Court of Appeals for the Third Circuit relied heavily on Justice Brennan's concurrence in
Metromedia in devising the following test: Content exempted from restriction had to be
significantly related to the particular area in which the sign was viewed. In addition, the state had
to show that an exemption to the regulation of speech was substantially related to advancing an
important state interest that was at least as important as the interests advanced by the underlying
regulation, that the exemption was no broader than necessary to advance the special goal, and that
the exemption was narrowly drawn so as to impinge as little as possible on the overall goal. Id. 
Because the court concluded that an exemption permitting offsite signs advertising local cities,
industries, and meetings was not related to the land on which the signs were placed, nor to the
function of the highway, the exemption constituted "impermissible content discrimination" and
rendered the statute unconstitutional. Id. at 1068.


 5. The United States Supreme Court's Ladue Opinion

 A case cited by both parties, which we find particularly persuasive, is City of Ladue
v. Gilleo, 512 U.S. 43 (1994). Justice Stevens delivered the unanimous opinion of the Court in
which a city ordinance prohibiting homeowners from displaying signs on their property was
declared an abridgement of First Amendment rights. Id. at 58-59.

 The ordinance allowed commercial businesses, churches, and nonprofit
organizations to display signs that were prohibited at residences. (7) Id. at 45. Gilleo sued the city
when she was denied a variance to display a twenty-four by thirty-six inch sign reading "Say No
to War in the Persian Gulf, Call Congress Now." Id. at 45-46. The district court held the city
ordinance unconstitutional. Relying on the plurality opinion in Metromedia, the United States
Court of Appeals for the Eighth Circuit affirmed. The Eighth Circuit found the ordinance a
content-based regulation that treated commercial speech more favorably than noncommercial
speech and treated some noncommercial speech more favorably than other noncommercial speech. 
Id. at 47. The city argued that the court of appeals erred by demanding that exemptions from the
ordinance be supported by compelling state interests. Id. at 52. The Supreme Court assumed
arguendo that the exemptions were content-neutral and turned instead to the question of "whether
Ladue may properly prohibit Gilleo from displaying her sign." Id. at 53.

 The Court made the following observations about the city's ordinance. The
purpose of the ordinance was to reduce visual clutter that threatened esthetics, property values,
privacy, and safety. Id. at 47. The Court observed that this was a "valid" purpose. Id. at 54. 
However, the ordinance totally foreclosed a "venerable," "unique," "important and distinct"
means of communication-residential signs-concerning political, religious, or personal messages. 
Id. at 54-55. Significantly, the Court held that even content-neutral prohibitions on speech could
violate the First Amendment simply by suppressing too much speech. Id. at 55 & n.13. The
Court was not convinced that there were adequate substitutes for the means of communication
completely banned by the city. Id. at 56.

 By virtue of their location, residential signs automatically identified the speaker--an
important component of attempts to persuade. Id. Additionally, since they were cheap and
convenient, they were perhaps the best means of reaching the intended audience-the speaker's
neighbors. Id. at 57. These same attributes were not true for any of the city's suggested
alternative means of communication: hand-held signs, letters, handbills, flyers, telephone calls,
newspaper advertisements, bumper stickers, speeches, and neighborhood or community meetings. 
Id. at 56. Thus, the Supreme Court affirmed the court of appeals judgment declaring the
ordinance unconstitutional. Id. at 59.


 E. The Texas HBA as Applied to Barber

 The parties have not cited a case, nor have we found one, that is directly on point--a
challenge to the Highway Beautification Act by a private-property owner foreclosed from
engaging in purely ideological speech on his own property. Many of the cases cited present
challenges by those who desired to speak on public or private property that they did not own. 
John Donnelly & Sons, 639 F.2d at 6; Ex parte Tucci, 859 S.W.2d at 1. Further, very few of the
cases deal with the type of speech at issue here-purely ideological speech. But see City of Ladue,
512 U.S. at 43.

 In recognition of property owners' right to the use and enjoyment of their property,
the legislature has drafted several narrow exemptions to the Act. (8)
 However, there is no exemption
that allows a private-property owner to engage in purely ideological speech on his own property. 
Cf. John Donnelly & Sons, 639 F.2d at 15. The Act prohibits purely ideological speech in
locations where it allows other types of speech, such as speech advertising onsite activities. Cf.
Metromedia, 453 U.S. at 513 (White, J., plurality op.). The Act would permit Barber to engage
in commercial speech and some types of noncommercial speech on his property, but prohibits
purely ideological speech. In effect, the Act bans purely ideological speech by Barber on his
private property. This is ironic in that ideological speech enjoys the greatest protection under the
United States Constitution. See Garrison v. Louisiana, 379 U.S. 64, 75 (1964) ("The First and
Fourteenth Amendments embody our 'profound national commitment to the principle that debate
on public issues should be uninhibited, robust, and wide-open, and that it may well include
vehement, caustic, and sometimes unpleasantly sharp attacks on government and public
officials.'") (citation omitted). Enforcement of the Texas HBA against Barber has inverted the
hierarchy of First Amendment protection. See Metromedia, 453 U.S. at 513 (White, J., plurality
op.). We hold that the Act in this regard is constitutionally infirm.

 Furthermore, Barber has no adequate alternative means of communicating his
message. The sign on his property identifies Barber as the speaker. Erecting a sign on property
he owns is comparatively cheap and convenient. It is probably the best means, and perhaps the
only means, of reaching his intended audience-drivers on Interstate 20. The Act would only
permit a comparable billboard in a commercial or industrial area, far from Barber's property. 
Other possible alternatives-hand-held signs, letters, handbills, flyers, telephone calls, newspaper
advertisements, bumper stickers, speeches, and neighborhood or community meetings-would be
more expensive, less convenient, and poorly suited to reaching his intended audience, which is,
by its nature, constantly changing. See City of Ladue, 512 U.S. at 56-57.


Especially for persons of modest means or limited mobility, a yard or window sign
may have no practical substitute. Even for the affluent, the added costs in money
or time of taking out a newspaper advertisement, handing out leaflets on the street,
or standing in front of one's house with a hand-held sign may make the difference
between participating and not participating in some public debate.



Id. at 57 (citations omitted).

 We are unpersuaded by the argument that the Act is constitutional because it treats
commercial and noncommercial speech the same, for example by permitting the advertisement of
all onsite activities, commercial and noncommercial. See Wheeler, 822 F.2d at 593. The truth
is that there is no commercial equivalent of Barber's purely ideological speech. See City of
Ladue, 512 U.S. at 57 n.15 ("unlike businesses (and even political organizations) individuals
generally realize few tangible benefits from such communication [of their views]"). Therefore,
without an exemption permitting ideological speech, commercial and noncommercial speech are
not treated equally.

 Finally, it was suggested at oral argument that any constitutional flaws in the Act
could be remedied by eliminating all exemptions and implementing a total ban of outdoor
advertising. On this point, it is well worth quoting the United States Supreme Court.


[T]he City might theoretically remove the defects in its ordinance by simply
repealing all of the exemptions. If, however, the ordinance is also vulnerable
because it prohibits too much speech, that solution would not save it. Moreover,
if the prohibitions in Ladue's ordinance are impermissible, resting our decision on
its exemptions would afford scant relief for respondent Gilleo. She is primarily
concerned not with the scope of the exemptions available in other locations, such
as commercial areas and on church property; she asserts a constitutional right to
display an antiwar sign at her own home.



Id. at 53. The same may be said of the Texas Highway Beautification Act.


CONCLUSION

 We reverse the trial court's grant of summary judgment permanently enjoining Pat
Barber from displaying and maintaining his outdoor advertising sign. We hold that the Texas
Highway Beautification Act is unconstitutional as enforced against Barber in his expression of
noncommercial, ideological speech on his own property and order that the Texas Department of
Transportation, its officials, and the Texas Attorney General are hereby enjoined from enforcing
the Act as to the previously erected sign. We reverse the trial court's judgment ordering Barber
to pay court costs and attorneys' fees. We remand this cause to the trial court for a determination
of fees and costs to which Barber may be entitled for having prevailed on this appeal.



 

 Mack Kidd, Justice

Before Justices Kidd, Yeakel and Powers*

Reversed and Rendered in Part; Reversed and Remanded in Part

Filed: April 5, 2001

Publish




* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. "Outdoor advertising" means an outdoor sign, display, light, device, figure,
painting, drawing, message, plaque, poster, billboard, or other thing designed,
intended, or used to advertise or inform if any part of the advertising or information
content is visible from the main-traveled way of the interstate or primary system. 
The term does not include a sign or marker giving information about the location of
an underground electric transmission line, telegraph or telephone property or facility,
pipeline, public sewer, or waterline. 


Tex. Transp. Code Ann. § 391.001(10) (West 1999). 
2. Licenses and permits are not required for signs advertising the sale or lease of the property
or activities conducted on the property. Tex. Transp. Code Ann. §§ 391.061(c), .031(b)(2), (3)
(West 1999).
3. The parties dispute whether the free speech provision of the Texas Constitution is more
protective of Barber's rights than the federal constitution. Because we hold that the Act violates
the federal guarantee of free speech, we need not resolve this question. The First Amendment
provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const.
amend. I. The Fourteenth Amendment makes this limitation applicable to the states. City of
Ladue v. Gilleo, 512 U.S. 43, 45 n.1 (1994). 
4. See, e.g., United States v. 29.28 Acres of Land, 162 F. Supp. 502, 513 (D.N.J. 1958)
(holding that government's sight easement across private property for nearby missile site required
compensation); United States v. 102.93 Acres of Land, 154 F. Supp. 258, 262 (E.D.N.Y. 1957),
aff'd sub nom. United States v. Fox, 257 F.2d 805 (2d Cir. 1958) (holding that sight easement
taken for military purposes required compensation of $750-$1125 per acre).
5. The federal HBA states that "[j]ust compensation shall be paid upon removal of any outdoor
advertising sign . . . for . . . [t]he taking from the owner of the real property on which the sign
. . . is located, of the right to erect and maintain such signs." 23 U.S.C.A. § 131(g)(B) (1990)
(emphasis added). The Texas HBA provides that if the commission acquires, by eminent domain,
advertising that is "lawfully in existence," the owner shall receive just compensation for "the right
to erect and maintain the outdoor advertising." Tex. Transp. Code Ann. § 391.033(a), (b)(2)
(West 1999) (emphasis added). However, the statutes provide for compensation only when
presently existing signs are removed or acquired by eminent domain and not compensation for the
property owner's loss of the right to erect new signs. See 23 U.S.C.A. § 131(g); Tex. Transp.
Code Ann. § 391.033(a), (b).
6. Onsite signs were defined as those "designating the name of the owner or occupant of the
premises upon which such signs are placed, or identifying such premises; or signs advertising
goods manufactured or produced or services rendered on the premises upon which such signs are
placed." Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 494 (1981). The specified
exemptions were as follows:


government signs; signs located at public bus stops; signs manufactured, transported,
or stored within the city, if not used for advertising purposes; commemorative
historical plaques; religious symbols; signs within shopping malls; for sale and for
lease signs; signs on public and commercial vehicles; signs depicting time,
temperature, and news; approved temporary, off-premises, subdivision directional
signs; and "[temporary] political campaign signs."


Id. at 494-95.
7. Homeowners could display only residence identification signs, for sale signs, and signs
warning of safety hazards. City of Ladue, 512 U.S. at 45. The ordinance permitted signs for
churches, religious institutions, and schools; identification signs for other not-for-profit
organizations; and commercial signs in commercially-zoned or industrially-zoned districts. Id.
at 47 n.6. 
8. Under the Act, Barber could have erected a sign "solely for and relating to a public
election." Tex. Transp. Code Ann. § 391.005 (West 1999). Election signs can be erected no
more than ninety days prior to an election and must be removed within ten days after an election. 
Id. § 391.005(2). Barber could have erected a sign for the sale or lease of the property on which
the sign was located. Id. § 391.031(b)(2). He could have erected a sign advertising activities
conducted on the property on which the sign was located. Id. § 391.031(b)(3). These activities
could be commercial (operation of a gas station or law practice) or noncommercial (political party
headquarters or Rotary Club meetings).




, or used to advertise or inform if any part of the advertising or information
content is visible from the main-traveled way of the interstate or primary system. 
The term does not include a sign or marker giving information about the location of
an underground electric transmission line, telegraph or telephone property or facility,
pipeline, public sewer, or waterline. 


Tex. Transp. Code Ann. § 391.001(10) (West 1999). 
2. Licenses and permits are not required for signs advertising the sale or lease of the property
or activities conducted on the property. Tex. Transp. Code Ann. §§ 391.061(c), .031(b)(2), (3)
(West 1999).
3. The parties dispute whether the free speech provision of the Texas Constitution is more
protective of Barber's rights than the federal constitution. Because we hold that the Act violates
the federal guarantee of free speech, we need not resolve this question. The First Amendment
provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const.
amend. I. The Fourteenth Amendment makes this limitation applicable to the states. City of
Ladue v. Gilleo, 512 U.S. 43, 45 n.1 (1994). 
4. See, e.g., United States v. 29.28 Acres of Land, 162 F. Supp. 502, 513 (D.N.J. 1958)
(holding that government's sight easement across private property for nearby missile site required
compensation); United States v. 102.93 Acres of Land, 154 F. Supp. 258, 262 (E.D.N.Y. 1957),
aff'd sub nom. United States v. Fox, 257 F.2d 805 (2d Cir. 1958) (holding that sight easement
taken for military purposes required compensation of $750-$1125 per acre).
5. The federal HBA states that "[j]ust compensation shall be paid upon removal of any outdoor
advertising sign . . . for . . . [t]he taking from the owner of the real property on which the sign
. . . is located, of the right to erect and maintain such signs." 23 U.S.C.A. § 131(g)(B) (1990)
(emphasis added). The Texas HBA provides that if the commission acquires, by eminent domain,
advertising that is "lawfully in existence," the owner shall receive just compensation for "the right
to erect and maintain the outdoor advertising." Tex. Transp. Code Ann. § 391.033(a), (b)(2)
(West 1999) (emphasis added). However, the statutes provide for compensation only when
presently existing signs are removed or acquired by eminent domain and not compensation for the
property owner's loss of the right to erect new signs. See 23 U.S.C.A. § 131(g); Tex. Transp.
Code Ann. § 391.033(a), (b).
6. Onsite signs were defined as those "designating the name of the owner or occupant of the
premises upon which such signs are placed, or identifying such premises; or signs advertising
goods manufactured or produced or services rendered on the premises upon which such signs are
placed." Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 494 (1981). The specified
exemptions were as follows:


government signs; signs located at public bus stops; signs manufactured, transported,
or stored within the city, if not used for advertising purposes; commemorative
historical plaques; religious symbols; signs within shopping malls; for sale and for
lease signs; signs on public and commercial vehicles; signs depicting time,
temperature, and news; approved temporary, off-premises, subdivision directional
signs; and "[temporary] political campaign signs."


Id. at 494-95.
7. Homeowners