**TEXAS DEPARTMENT OF TRANSPORTATION, et al., Petitioners,**

v.

**Pat BARBER, Respondent.**

**No. 01–0414.**

Supreme Court of Texas.

Argued Nov. 14, 2002.

Decided July 3, 2003.

---

· Howard G. Baldwin, First Assistant Atty. Gen. of Texas, Robert Searls Johnson, Asst. Solicitor General, Julie Caruthers Parsley, Office of the Solicitor General of Texas, Jeffrey S. Boyd, Office of the Attorney General, Austin, Meredith Bishop Parenti, Weil Gotshal & Manges, College Station, John Cornyn, United States Senate, Washington, DC, William Rich Thompson, II, Austin, for Petitioners.

James C. Harrington, Texas Civil Rights Project, Ted Anthony Ross, Asst. Atty. Gen., Sheri Joy Nasya Tolliver, Texas Civil Rights Project, Austin, for Respondent.

Justice ENOCH delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice O'NEILL, Justice JEFFERSON, Justice SCHNEIDER, and Justice WAINWRIGHT joined.

This case involves the constitutionality of the Texas Highway Beautification Act.[1] We must decide whether the Act, which precludes Pat Barber from displaying a particular billboard on his nonresidential property, violates Barber's free speech rights under the United States Constitution or the Texas Constitution. The court of appeals held that the Act violated Barber's rights under the United States Constitution as applied to his expression of noncommercial, ideological speech.[2] We disagree and hold that the Act is content neutral and constitutes a valid time, place, and manner restriction as applied to Barber's billboard. We therefore conclude that it does not violate Barber's federal guarantee of free speech. We also conclude that the Texas Constitution affords him no more protection under the circumstances than the federal constitution. We accordingly reverse the court of appeals' judgment and render judgment for petitioners (collectively, "TxDOT").

## I. THE TEXAS HIGHWAY BEAUTIFICATION ACT

The Texas Highway Beautification Act was passed in response to the Federal Highway Beautification Act, which requires states to effectively control the erection and maintenance of signs within 660 feet of interstate and primary highways and beyond 660 feet in non-urban areas if the signs are designed to be and are visible from such highways.[3] The Federal Act seeks to curb the proliferation of signs along the nation's highways and to "protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty."[4] The Federal Highway Beautification Act provides that if states fail to make provisions for effectively controlling such signs, they risk losing ten percent of their federal highway funds.[5]

1. TEX. TRANSP. CODE ch. 391.

2. 49 S.W.3d 12, 25.

3. 23 U.S.C. § 131(a), (c).

4. *Id.* § 131(a).

5. *Id.* § 131(b).

The express purpose of the Texas Act is to comply with federal law: "[I]t is the intent of the legislature to comply with the Highway Beautification Act of 1965 (23 U.S.C. Sections 131, 136, 319) to the extent that it is implemented by the United States Congress. This chapter is conditioned on that law."[6] The Texas Act declares that outdoor advertising erected in non-compliance with its provisions "endangers the health, safety, welfare, morals, convenience, and enjoyment of the traveling public and the protection of the public investment in the interstate and primary highway systems."[7] It also constitutes a "public nuisance."[8]

■■■■■ Thus, the Texas Act prohibits "outdoor advertising" in a limited area: (1) within 660 feet of a right-of-way, if the advertisement is visible from the interstate or primary highway system, or (2) if outside an urban area, more than 660 feet from the right-of-way, but visible from the highway and erected for the purpose of having its message seen from the highway.[9] "Outdoor advertising" is defined as:

> an outdoor sign, display, light, device, figure, painting, drawing, message, plaque, poster, billboard, or other thing designed, intended, or used to advertise or inform if any part of the advertising or information content is visible from the main-traveled way of the interstate or primary system.[10]

The Texas Act specifically exempts from regulation:

> (1) directional or other official outdoor advertising authorized by law, including advertising pertaining to a natural wonder or a scenic or historic attraction;

(2) outdoor advertising for the sale or lease of the property on which it is located;

(3) outdoor advertising solely for activities conducted on the property on which it is located;

(4) outdoor advertising located within 660 feet of the nearest edge of a right-of-way in an area in which the land use:

> (A) is designated industrial or commercial under authority of law; or

> (B) is not designated industrial or commercial under authority of law but the land use is consistent with an area designated industrial or commercial;

(5) outdoor advertising that has as its purpose the protection of life and property; or

(6) outdoor advertising erected on or before October 22, 1965, that the commission, with the approval of the secretary of the United States Department of Transportation, determines to be a landmark of such historic or artistic significance that preservation is consistent with the purposes of this subchapter.[11]

In addition, the Texas Act exempts from regulation a sign erected solely for and relating to a public election if the sign:

(1) is on private property;

(2) is erected not earlier than the 90th day before the date of the election and is removed not later than the 10th day after the election date;

(3) is constructed of lightweight material; and

---

6. Tex. Transp. Code § 391.002(a).

7. *Id.* § 391.034(a)(1).

8. *Id.* § 391.034(a)(2).

9. *Id.* § 391.031(a)(1), (2).

10. *Id.* § 391.001(10).

11. *Id.* § 391.031(b).

(4) has a surface area not larger than 50 square feet.[12]

## II. THIS CASE'S HISTORY

In 1997, Barber, who is an attorney, installed an eight foot by sixteen foot billboard on nonresidential property he owned adjacent to Interstate 20, in Mitchell County, Texas. The billboard stated, "Just say NO to Searches," and displayed a telephone number. Callers to that number reached an answering machine that played a two-minute, pre-recorded message about a citizen's rights to refuse to have their vehicles searched by police:

> This recorded information is provided as a public service by Pat Barber's Law Office in regard to the large number of unreasonable searches being pursued by state officers on the highways. Officers are relying on people's ignorance of their right to search.
>
> Many people are being intimidated; often, when an officer has asked for a search and is refused, the officer will threaten to obtain a warrant from a judge. This threat is a bluff because most of the time the officer doesn't have probable cause. When an officer threatens to get a warrant and knows he doesn't have probable cause, he is intimidating the citizen through deception.
>
> Most people don't know that an officer can't get a warrant to search unless he proves to a judge that probable cause of a criminal offense exists.
>
> An innocent citizen may have nothing to hide, but has done nothing wrong, and should know that when an unreasonable search request is refused, the officer must let him go.
>
> When an officer has permission to search, the vehicle may be taken apart

and the contents are thrown on the ground so the drug dogs can work.

> I know about one lady traveling in a late model suburban who was seen standing by the side of the road trying to hold her hair together in a 20 m.p.h. wind while officers threw her possessions on the ground. After the officers finished the search and left, a local citizen stopped and helped her pick up her things.
>
> I am offended by this kind of police behavior, and I feel a duty to inform citizens about their rights.
>
> Just say NO to Searches ... it's your constitutional right.
>
> If you would like to leave a message, please wait for the beep. Good luck and have a safe trip.

A newspaper story about the billboard appeared in the *Abilene Reporter News*. Barber asserts that, shortly thereafter, he received a letter from TxDOT, the entity charged with enforcing the Texas Highway Beautification Act,[13] stating that the billboard violated the Act and requesting that Barber remove it. According to Barber, TxDOT did this even though many other roadsigns in Mitchell County did not comply with the Act. Correspondence between Barber and TxDOT ensued but no agreement was reached, and TxDOT set a deadline for Barber to remove his billboard.

In response, Barber filed suit seeking injunctive relief and a declaratory judgment that the Act is unconstitutional. TxDOT counterclaimed, seeking a permanent injunction requiring Barber to remove his billboard. Barber initially secured a temporary injunction prohibiting TxDOT from enforcing the Act against him. But the trial court subsequently overturned the injunction and granted

---

12. *Id.* § 391.005.

13. *See id.* § 391.034(b).

summary judgment to TxDOT, holding that the Act was constitutional under the Texas and United States constitutions, both on its face and as applied to Barber. The trial court permanently enjoined Barber from displaying the billboard. Barber removed his billboard and appealed the trial court's judgment.

The court of appeals reversed.[14] The court of appeals held that the Texas Highway Beautification Act, as applied to Barber, violated the First Amendment to the United States Constitution.[15] According to the court of appeals, the Act permitted Barber to engage in commercial speech and some types of noncommercial speech on his property, but it prohibited purely ideological speech by Barber on his property.[16] Further, the court of appeals concluded that Barber had no adequate alternative means of communicating his message.[17] Because the court concluded that the Act violated Barber's federal guarantee of free speech, it did not resolve the question raised by Barber of whether the Texas Constitution provides more protection than the United States Constitution.[18]

TxDOT petitioned this Court to consider these important constitutional questions. We granted the petition and requested supplemental briefing on whether the questions raised were moot because Barber had removed his billboard in compliance with the trial court's judgment. We conclude that the questions are not moot,[19] and we now address them on the merits.

## III. ANALYSIS

### A. The United States Constitution's First Amendment

■ It is well-settled that "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."[20] But the Supreme Court also has recognized that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner.[21] Both written and oral expression may be subject to reasonable time, place, and manner restrictions.[22] Further, the Supreme Court has announced a two-tier approach, generally, for reviewing regulations on speech.

■ For the higher tier, "regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content," the Court applies "the most exacting scrutiny."[23] Such content-based regulations are presumptively invalid,[24] and they can withstand strict scrutiny only if precisely drawn to serve a compelling

---

14. 49 S.W.3d at 12, 25.

15. *Id.* at 24–25.

16. *Id.* at 24.

17. *Id.* at 25.

18. *Id.* at 16 n. 3.

19. *Cf. Williams v. Lara,* 52 S.W.3d 171, 184 (Tex.2001).

20. *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).

21. *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

22. *Clark v. Cmty. For Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

23. *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

24. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

state interest.[25]  For the lower tier, "regulations that are unrelated to the content of speech," the Court applies an "intermediate level of scrutiny."[26]  Such content-neutral regulations are valid provided they are narrowly tailored to serve a substantial governmental interest,[27] and they do not unreasonably limit alternative channels for communicating the information.[28]

■  Determining which tier applies—i.e., whether a regulation is content neutral or content based—is often not a simple task.  A content-neutral regulation generally must be both viewpoint neutral and subject-matter neutral.[29]  As the Supreme Court has stated, "[r]egulation of the subject matter of messages, though not as obnoxious as viewpoint-based regulation, is also an objectionable form of content-based regulation."[30]

■  To be viewpoint neutral, a regulation must not be based on the message's ideology.  For example, in *Boos v. Barry,* the Supreme Court declared unconstitutional a District of Columbia ordinance that prohibited displaying signs critical of a foreign government within 500 feet of that government's embassy.[31]  The ordinance impermissibly distinguished be-tween what signs were allowed and what signs were prohibited based on the viewpoint expressed.[32]

■  To be subject-matter neutral, a regulation must not be based on the speech's topic.  For example, in *Carey v. Brown,*[33] the Supreme Court held unconstitutional an ordinance prohibiting all picketing in residential neighborhoods unless it was labor picketing connected to a place of employment.  The Court explained that, though not restricting which view about labor may be expressed, the ordinance prohibited all speech except speech about the subject of labor.[34]  Thus, the regulation was content based and impermissible.[35]

But the Supreme Court has indicated a willingness to treat some content-based regulations as content neutral if the regulations are motivated by a permissible content-neutral purpose.  For example, in *City of Renton v. Playtime Theatres, Inc.,*[36] the Court upheld a zoning ordinance that kept adult movie theaters out of residential neighborhoods.  The ordinance clearly was not subject-matter neutral, applying specifically to adult movie theaters.  The Court nevertheless concluded that be-

**25.** *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n,* 447 U.S. 530, 540, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980).

**26.** *Turner Broad. Sys., Inc.,* 512 U.S. at 642, 114 S.Ct. 2445.

**27.** *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Clark,* 468 U.S. at 293, 104 S.Ct. 3065; *Taxpayers for Vincent,* 466 U.S. at 808, 104 S.Ct. 2118; *Heffron,* 452 U.S. at 647–48, 101 S.Ct. 2559.

**28.** *City of Renton,* 475 U.S. at 47, 106 S.Ct. 925; *Clark,* 468 U.S. at 293, 104 S.Ct. 3065; *Taxpayers for Vincent,* 466 U.S. at 808, 104 S.Ct. 2118; *Heffron,* 452 U.S. at 647–48, 101 S.Ct. 2559.

**29.** *See, e.g., Hill v. Colorado,* 530 U.S. 703, 722–23, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

**30.** *Id.* at 723, 120 S.Ct. 2480.

**31.** 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

**32.** *Id.*

**33.** 447 U.S. 455, 471, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980).

**34.** *Id.* at 468, 100 S.Ct. 2286.

**35.** *Id.*

**36.** 475 U.S. at 48, 106 S.Ct. 925.

cause the ordinance was aimed, not at the content of the films shown in the theaters, but rather at the "secondary effects"—such as crime and deteriorating property values—that such theaters fostered,[37] the "ordinance is completely consistent with [the] definition of 'content-neutral' speech regulations as those that 'are *justified* without reference to the content of the regulated speech.' "[38]

Although Barber contends that the Supreme Court's holding in *City of Renton* is limited to the adult theater context, we disagree. For example, the Supreme Court used the analysis from *City of Renton* in *Ward v. Rock Against Racism.*[39] In *Ward*, Rock Against Racism, an association "dedicated to the espousal and promotion of antiracist views,"[40] challenged the constitutionality of a city's volume-control guidelines. Those guidelines required all performers to use the city's sound equipment and sound technician for performances at a particular park bandshell.[41] The Court noted that the principal justification for the guidelines was the city's desire to control noise levels and to avoid undue intrusion into residential areas and other areas of the park.[42]

In upholding the guidelines as content neutral, the Court in *Ward* explained:

> The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner

cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.... The government's purpose is the controlling consideration.[43]

Citing to *City of Renton*, the Court in *Ward* concluded:

> A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.... Government regulation of expressive activity is content neutral so long as it is *"justified* without reference to the content of the regulated speech."[44]

In *Boos v. Barry*,[45] the Court also looked to *City of Renton*. In *Boos*, the United States argued that an ordinance restricting speech critical of foreign governments near their embassies was justified based on an international law obligation to shield diplomats from speech that offends their dignity.[46] The Court, in declaring that part of the law unconstitutional, distinguished *City of Renton* because the ordinance restricting speech near embassies was:

> justified only by reference to the content of the speech. Respondents and the United States do not point to the "secondary effects" of picket signs in front of embassies. They do not point to con-

---

37.  *Id.* at 47–48, 106 S.Ct. 925.

38.  *Id.* at 48, 106 S.Ct. 925 (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)) (emphasis in original).

39.  491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

40.  *Id.* at 784, 109 S.Ct. 2746.

41.  *Id.* at 787, 109 S.Ct. 2746.

42.  *Id.* at 792, 109 S.Ct. 2746 (citation omitted).

43.  *Id.* at 791, 109 S.Ct. 2746 (citations omitted).

44.  *Id.* (citations omitted) (emphasis in original).

45.  485 U.S. at 320–21, 108 S.Ct. 1157.

46.  *Id.* at 321, 108 S.Ct. 1157.

gestion, to interference with ingress or egress, to visual clutter, or to the need to protect the security of embassies. Rather, they rely on the need to protect the dignity of foreign diplomatic personnel by shielding them from speech that is critical of their governments. This justification focuses only on the content of the speech and the direct impact that speech has on its listeners.[47]

Other Supreme Court cases also provide guidance in determining whether a regulation is content based. For example, in *Metromedia, Inc. v. City of San Diego*,[48] a case relied upon by Barber and the court of appeals, the Court in a plurality opinion considered the constitutionality of a city's ordinance that imposed substantial prohibitions on erecting outdoor advertising displays within the city. The ordinance prohibited noncommercial signs, with certain limited exceptions, and offsite commercial signs, but allowed onsite commercial signs.[49] The Court upheld the ordinance in prohibiting offsite commercial messages, but declared it unconstitutional in prohibiting onsite noncommercial messages. Writing for the plurality, Justice White noted that, with respect to commercial messages:

> the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, [and] obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends.[50]

But Justice White concluded that these same concerns did not warrant prohibiting billboards that contained noncommercial speech:

> The fact that the city may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others.... There is a broad exception for onsite commercial advertisements, but there is no similar exception for noncommercial speech. The use of onsite billboards to carry commercial messages related to the commercial use of the premises is freely permitted, but the use of otherwise identical billboards to carry noncommercial messages is generally prohibited.... Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages.[51]

The *Metromedia* plurality also expressed concern because the ordinance permitted only specified types of noncommercial signs in districts zoned as commercial or industrial.[52] But the ordinance allowed all types of commercial advertising in those same districts. This distinction prompted the plurality to state:

> Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice

47. *Id.*

48. 453 U.S. 490, 493, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (White, J., plurality opinion.).

49. *Id.* at 513–15, 101 S.Ct. 2882.

50. *Id.* at 508, 101 S.Ct. 2882.

51. *Id.* at 513, 101 S.Ct. 2882.

52. *Id.* at 514, 101 S.Ct. 2882.

in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests.... With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse: "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." ... Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.[53]

The plurality concluded that because the ordinance "reaches too far into the realm of protected speech ... it is unconstitutional on its face."[54]

The concurring opinion in *Metromedia*, authored by Justice Brennan and joined by Justice Blackmun, concluded that "the *practical* effect of the San Diego ordinance [was] to eliminate the billboard as an effective medium of communication"[55] for noncommercial messages, and that the city had failed to make the strong showing needed to justify such "content-neutral prohibitions of particular media of communication."[56] The three dissenters also viewed the ordinance as tantamount to a blanket prohibition of billboards, but they would have upheld it because they did not perceive "even a hint of bias or censorship in the city's actions" nor "any reason to believe that the overall communications market in San Diego is inadequate."[57]

In *City of Cincinnati v. Discovery Network, Inc.*,[58] the Court declared unconstitutional an ordinance prohibiting newsracks on public property for distributing commercial handbills. The city permitted newsracks that contained ordinary newspapers. The city argued that the ordinance was justified by concern over the secondary effects of such newsracks with regard to safety and aesthetics. But the Court rejected this argument, stating:

Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is "content based."[59]

The Court explained that "[i]n contrast to the speech at issue in [*City of*] *Renton*, there are no secondary effects attributable to ... newsracks [containing commercial handbills] that distinguish them from the newsracks [containing newspapers that the city] permits to remain on its sidewalks."[60]

Finally, in *City of Ladue v. Gilleo*,[61] the Court took a somewhat different approach in determining whether a city's ordinance that prohibited all signs within city limits, except those that fell within ten limited exemptions, was constitutional. Gilleo challenged the ordinance because it pro-

---

53. *Id.* at 514–15, 101 S.Ct. 2882 (citations omitted).

54. *Id.* at 521, 101 S.Ct. 2882.

55. Id. at 525, 101 S.Ct. 2882 (Brennan, J., concurring) (emphasis in original).

56. *Id.* at 526–27, 101 S.Ct. 2882.

57. *Id.* at 552–53, 101 S.Ct. 2882 (Stevens, J., dissenting in part); *see id.* at 563, 566, 101 S.Ct. 2882 (Burger, C.J., dissenting); *see also* *id.* at 569–70, 101 S.Ct. 2882 (Rehnquist, J., dissenting).

58. 507 U.S. 410, 412, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

59. *Id.* at 429, 113 S.Ct. 1505.

60. *Id.* at 430, 113 S.Ct. 1505.

61. 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

hibited her from displaying a sign in the window of her home stating, "For Peace in the Gulf." In analyzing the ordinance, the Court noted that "[e]xemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale for restricting speech in the first place." [62]

In examining the city's "near-total" prohibition of residential signs, the Court assumed *arguendo* that the ordinance was free of impermissible content or viewpoint discrimination.[63] Instead, the Court first asked whether the city could properly prohibit Gilleo from displaying an antiwar sign at her own home.[64] Then the Court stated that, only if necessary, would it consider whether it was improper for the city simultaneously to permit certain other signs.[65]

The Court focused on the fact that the ordinance affected residential property and concluded that the ordinance went too far in banning speech because it did not leave open adequate alternative channels of communication. The Court explained:

In this case, we are not persuaded that adequate substitutes exist for the important medium of speech that Ladue has closed off.

Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location, such signs provide information about the identity of the "speaker." ... [T]he identity of the speaker is an important component of many attempts to persuade.... A sign advocating "Peace in the Gulf" in the front lawn of a retired general or decorated war veteran may provoke a different reaction than the same sign in a 10–year–old child's bedroom window or the same message on a bumper sticker of a passing automobile.[66]

The Court also looked at the costs associated with communicating through an alternative forum and the intended audience of the communication. The Court stated:

Residential signs are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute.... Even for the affluent, the added costs in money or time of taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a hand-held sign may make the difference between participating and not participating in some public debate.... Furthermore, a person who puts up a sign at her residence often intends to reach *neighbors,* an audience that could not be reached nearly as well by other means.[67]

In concluding that the ordinance violated the First Amendment, the Court emphasized the special status of speaking from one's own home:

A special respect for individual liberty in the home has long been part of our culture and our law ...; that principle has special resonance when the govern-

---

62. *Id.* at 52, 114 S.Ct. 2038.

63. *Id.* at 53, 114 S.Ct. 2038.

64. *Id.*

65. *Id.*

66. *Id.* at 56, 114 S.Ct. 2038 (citations and footnote omitted).

67. *Id.* at 57, 114 S.Ct. 2038 (citations and footnote omitted) (emphasis in original).

ment seeks to constrain a person's ability to *speak* there. . . . Most Americans would be understandably dismayed, given that tradition, to learn that it was illegal to display from their window an 8–by 11–inch sign expressing their political views. Whereas the government's need to mediate among various competing uses, including expressive ones, for public streets and facilities is constant and unavoidable, . . . its need to regulate temperate speech from the home is surely much less pressing.[68]

■■■ These cases provide a framework for analyzing whether the Texas Highway Beautification Act infringes upon Barber's First Amendment free speech rights. Recognizing that the Supreme Court took a somewhat different approach to analyzing speech regulation in *City of Ladue*, we think the Supreme Court's traditional analysis,[69] as the parties also advocate, applies here. Under that analysis, we first determine which tier applies—i.e., whether the Act is content based or content neutral. Then, based on the answer to that question, we apply the proper level of scrutiny.[70]

Initially, we note that no one argues that Barber's speech is anything other than noncommercial speech, even though those calling the telephone number on his sign would learn that Barber was an attorney. Accordingly, we assume that only noncommercial speech is at issue here. Barber denominates it as "political ideological speech," but we need not for purposes of our analysis differentiate between categories of noncommercial speech. In addition, we reject Barber's contention that because "political ideological speech" is at

issue, the Texas Act automatically is subject to strict scrutiny. As the Supreme Court cases just discussed demonstrate, regulations involving noncommercial speech—which includes political and ideological speech-can be subject to intermediate scrutiny if they are content neutral.

In determining whether the Texas Act is content neutral, we recognize (and the parties concede) that the Act does not endorse any particular viewpoint. The Act, however, does make certain distinctions based on subject matter. For example, the Act exempts from regulation directional signs, signs pertaining to natural wonders or scenic or historic attractions, signs for the sale of property on which they are located, signs designed to protect life and property, and signs providing information about the location of utility lines.[71] The Act also exempts temporary signs relating to public elections and signs relating to activities conducted on the property where the signs are located.[72]

Barber focuses his argument primarily on the latter two exemptions. He contends that by prohibiting "ideological political speech" but allowing "electoral political speech," i.e., temporary signs relating to public elections, the Texas Act regulates based on content. He also asserts that the Act favors commercial over noncommercial speech and favors some noncommercial speech (e.g., "electoral political speech") over other noncommercial speech (e.g., "ideological political speech").

The court of appeals, without expressly saying so, apparently agreed that the Act

---

68. *Id.* at 58, 114 S.Ct. 2038 (citations and footnote omitted) (emphasis in original).

69. *See id.* at 59, 114 S.Ct. 2038 (O'Connor, J., concurring).

70. *See id.*

71. Tex. Trans. Code § 391.031(b).

72. *Id.* § 391.005; *id.* § 391.031(b)(3).

was content based.[73] Citing *Metromedia,* the court of appeals stated:

> The Act prohibits purely ideological speech in locations where it allows other types of speech, such as speech advertising onsite activities.... The Act would permit Barber to engage in commercial speech and some types of noncommercial speech on his property, but prohibits purely ideological speech. In effect, the Act bans purely ideological speech by Barber on his private property. This is ironic in that ideological speech enjoys the greatest protection under the United States Constitution.... The truth is that there is no commercial equivalent of Barber's purely ideological speech.... Therefore, without an exemption permitting ideological speech, commercial and noncommercial speech are not treated equally.[74]

We disagree with Barber's argument and the court of appeals' conclusion that the Act is content based. The Act defines "outdoor advertising" broadly. It includes both commercial and noncommercial speech, encompassing "advertising or information." [75] Further, the Act permits both types of speech in noncommercial and non-industrial areas as long as that speech relates to activities on the property. It also permits both types of speech in commercial and industrial areas, regardless of whether that speech relates to activities on the property. The dissent succumbs to Barber's argument by asserting that the Act "permits on-site commercial speech and *some* noncommercial speech," as if the Act allows all onsite commercial speech and more limited noncommercial speech.[76] But that is incorrect. As we have just said, the Act allows all onsite commercial speech and *all* onsite noncommercial speech.

These key factors distinguish the Texas Act from the ordinance in *Metromedia.* The ordinance in *Metromedia* only allowed onsite commercial signs, but prohibited other (offsite) commercial advertising and prohibited all noncommercial communications everywhere unless permitted by one of twelve exemptions.[77] As discussed, the Texas Act is different. The Texas Act permits commercial and noncommercial speech everywhere that relates to an activity on the property. In addition, it permits both types of speech in all commercial and industrial areas, even if the speech does not relate to an activity on the property. Therefore, the Texas Act does not run afoul of the concerns the plurality or concurrence expressed in *Metromedia.*

■ Although the parties make no mention of them in their briefing, we must note that TxDOT has adopted its own rules implementing the Act's provisions.[78] Under those rules, TxDOT considers an "on-premise" sign to be:

> a sign that refers to commercial activity or business located on the same property if the sign:
>
> (i) consists solely of the name of the establishment;
>
> (ii) identifies the establishment's principal product or services; or
>
> (iii) advertises the sale or lease of the property on which the sign is located.[79]

---

73. *See* 49 S.W.3d at 24.

74. *Id.* at 24, 25.

75. Tex. Trans. Code § 391.001(10).

76. 111 S.W.3d at 107 (emphasis added).

77. *Metromedia, Inc.,* 453 U.S. at 494–96, 101 S.Ct. 2882.

78. *See, e.g.,* 43 Tex. Admin. Code ch. 21, subch. I.

79. *Id.* § 21.147(b)(1)(A).

By restricting "on-premise" signs to those relating to a commercial activity or business, TxDOT's rules do run afoul of the concerns expressed by *Metromedia's* plurality and concurrence. But the restriction in TxDOT's rules is not supported by the Act's language, which defines "outdoor advertising" as something designed to "advertise or inform." [80] As we have discussed, that definition is broad enough to include both commercial and noncommercial speech. Because TxDOT's regulations are constitutionally suspect and do not comport with the Act's language, we decline to give them deference. [81]

Beyond this, the Texas Legislature did not adopt the Texas Highway Beautification Act because it disagreed with any messages that might otherwise be conveyed. Rather, the Legislature adopted the Act, in accordance with the Federal Highway Beautification Act, to control the secondary effects of billboards and signs along the interstate and primary highway system. Those effects include stemming visual clutter on the landscape, which the Legislature considered to be a public nuisance, and promoting travel safety. [82] Accordingly, the Act is also content neutral because it is *"justified* without reference to the content of the regulated speech." [83]

The Act's exemptions for temporary election signs on any property (both industrial and non-industrial) and for signs, other than temporary election signs, in non-commercial and non-industrial areas that relate to activities on the premises do not render the Act content based. We note

that Barber is asserting only an as-applied challenge to the Act here, not a facial challenge, and the election sign exemption does not apply to Barber. It is the Act's general prohibition against billboards that applies to Barber, which we have concluded is content neutral. Nevertheless, Barber relies on the election sign exemption to argue that the Act favors some noncommercial speech over other noncommercial speech. Barber also uses that exemption to argue that the Act fails the "secondary effects" test because TxDOT cannot prove that his "political ideological message" is more harmful than temporary election signs or signs advertising onsite activities. We disagree.

Though the election sign exemption is arguably content based, as the Supreme Court has stated, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." [84] Here, although Barber contends that elections are virtually "year-round" in Texas, the exemption allows signs for only a limited time period before and after the elections to which they pertain. And presumably for local elections, at least, such signs will be relegated to localized areas and will not be placed throughout the interstate and primary highway system. The exemption is consistent with the goal of minimizing "outdoor advertising" along this limited federal corridor. [85]

The exemption for signs relating to on-site activities likewise does not render the

---

80.  TEX. TRANS. CODE § 391.001(10).

81.  *See In re Am. Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 490–91 (Tex.2001).

82.  *See* TEX. TRANSP. CODE § 391.002(b)(1), (2); *id.* § 391.034(a).

83.  *See City of Renton,* 475 U.S. at 48, 106 S.Ct. 925 (quotation omitted) (emphasis in original).

84.  *Ward,* 491 U.S. at 791, 109 S.Ct. 2746.

85.  *Compare Discovery Network, Inc.,* 507 U.S. at 429, 113 S.Ct. 1505.

Act content based. We are persuaded in this regard by the Sixth Circuit's analysis of the Kentucky Billboard Act, also adopted in response to the Federal Highway Beautification Act, in *Wheeler v. Commissioner of Highways.*[86] In concluding that the Kentucky Act was constitutional, the Sixth Circuit stated that the Kentucky Act's exemptions, like those in the Texas Act:

> permit commercial and non-commercial signs in protected areas as long as the signs relate to an activity on the premises. Messages such as "Abortion is Murder," or "No Nukes" are permissible if an activity related to the message is conducted on the premises.... [T]he Billboard Act and regulations apply evenhandedly to commercial and non-commercial speech; they discriminate against no viewpoint or subject matter.[87]

The Sixth Circuit also noted that the Kentucky Legislature enacted the Act, in part, "to preserve and enhance the natural scenic beauty or the aesthetic features of ... interstate highways" and not "to prevent the citizens of Kentucky from receiving certain information."[88] Thus, the Sixth Circuit concluded:

> We believe that the Billboard Act and regulations are content neutral. They are not directed at the content of the messages, but at their secondary effects.... Furthermore, the on-premises/off-premises distinction does not constitute an impermissible regulation of content just because the determination of whether a sign is permitted at a given location is a function of the sign's message. Kentucky, by allowing per-

sons who own or lease property, to have a sign, subject to size and space restrictions, advertising an activity conducted on the property is not favoring one message over another. The state has simply recognized that the right to advertise an activity conducted on-site is inherent in the ownership or lease of the property.[89]

We are also persuaded by the Eleventh Circuit's analysis in *Messer v. City of Douglasville.*[90] In *Messer,* the Eleventh Circuit held that a city ordinance allowing onsite noncommercial signs while denying offsite noncommercial signs was constitutionally permissible.[91] The Eleventh Circuit stated that the ordinance:

> regulates signs not based on the viewpoint of the speaker, but based on the location of the signs. There is no claim of bias, censorship or preference regarding a speaker's point of view. The ordinance does not favor commercial over non-commercial speech; neither does it favor non-commercial over commercial speech.... A noncommercial enterprise would be able to put up a sign bearing a noncommercial message as long as it relates to any activity on the premises. Similarly, a commercial enterprise would be able to put up a sign bearing a noncommercial message which related to any activity on the premises. For example, an auto mechanic's garage would be able to put up a noncommercial message relating to the recycling of used motor oil.[92]

Much like the regulations in *Wheeler* and *Messer,* the Texas Act's exemption for

**86.** 822 F.2d 586 (6th Cir.1987).

**87.** *Id.* at 590.

**88.** *Id.* at 591.

**89.** *Id.* at 590, 591.

**90.** 975 F.2d 1505 (11th Cir.1992).

**91.** *Id.* at 1509.

**92.** *Id.*

onsite activity does not favor commercial speech over noncommercial speech. It regulates signs based on their location. Therefore, the exemption does not render the Act content based.

Those cases from other jurisdictions suggesting otherwise are distinguishable.[93] For example, some involve ordinances that, unlike the Texas Act, allow only onsite noncommercial messages without allowing any offsite noncommercial messages.[94] The Texas Act, in contrast, permits any noncommercial message in industrial or commercial areas. Moreover, one case adopted a new test for determining constitutionality that states:

> [W]hen there is a significant relationship between the content of particular speech and a specific location or its use, the state can exempt from a general ban speech having that content so long as the state did not make the distinction in an attempt to censor certain viewpoints or to control what issues are appropriate for public debate and so long as the exception also survives the test proposed by the *Metromedia* concurrence.[95]

Without deciding the merits of that test, we apply the traditional test developed from Supreme Court precedent for determining whether a regulation is content based. And under that test, the Texas Act is content neutral.

The dissent contends that *Discovery Network's* rationale supports its conclusion that the Texas Act is not content neutral.[96] But *Discovery Network* is readily distinguishable from this case. In *Discovery Network,* an ordinance prohibited commercial handbills from being distributed in newsracks while allowing newspapers to be sold. Thus, the Court assumed that the ordinance completely prohibited what it characterized as "core" commercial speech while allowing other speech.[97] The Court concluded that, although the city asserted that an interest in aesthetics justified the ordinance, the ordinance did not limit the number of newsracks; it "limited (to zero) the number of newsracks *distributing commercial publications.*"[98]

Here, in contrast to the *Discovery Network* ordinance, the Texas Act does not completely prohibit either commercial or noncommercial speech. Rather, both types of speech are allowed without restriction in commercial and industrial areas. And both types of speech are allowed in noncommercial and non-industrial areas if the speech relates to an activity on the premises. In addition, as the dissent points out, the Texas Act allows directional signs to scenic or historic attractions and temporary election signs, under exemptions not applicable to Barber, even if they do not relate to activities onsite. And these exemptions, unlike the ordinance in

93. *See, e.g., Ackerley Communications of Mass., Inc. v. City of Cambridge,* 88 F.3d 33, 37 (1st Cir.1996); *Rappa v. New Castle County,* 18 F.3d 1043, 1063 (3d Cir.1994); *Nat'l Adver. Co. v. City of Orange,* 861 F.2d 246, 247–48 (9th Cir.1988); *John Donnelly & Sons v. Campbell,* 639 F.2d 6, 15 (1st Cir.1980); *Union City Bd. of Zoning Appeals v. Justice Outdoor Displays, Inc.,* 266 Ga. 393, 467 S.E.2d 875, 879 (1996).

94. *E.g., Ackerley Communications of Mass., Inc.,* 88 F.3d at 37; *Nat'l Adver. Co.,* 861 F.2d at 247–48; *John Donnelly & Sons,* 639 F.2d at 15; *Union City Bd. of Zoning Appeals,* 467 S.E.2d at 879.

95. *See, e.g., Rappa,* 18 F.3d at 1065.

96. 111 S.W.3d at 108.

97. *Discovery Network,* 507 U.S. at 424, 113 S.Ct. 1505.

98. *Id.* at 429, 113 S.Ct. 1505 (emphasis in original).

*Discovery Network,*[99] do bear a direct relationship to the State's interest in promoting travel safety while minimizing the number of signs along a narrow federal corridor. *Discovery Network* is thus factually and legally distinguishable from this case, and its rationale does not govern here.

■ Because the Texas Act is content neutral, this puts us in the lower tier. In this tier, we must decide whether the Act is narrowly tailored to serve a substantial state interest.[100] The Act is primarily concerned with promoting aesthetics and travel safety by regulating the placement of billboards and signs. The parties do not dispute that the Act serves a substantial state interest. But regardless, aesthetics and public safety on the highway are recognized as substantial governmental goals.[101]

Barber argues that, despite serving substantial state interests, the Act is not narrowly tailored because it substantially overburdens political speech. According to Barber, the Act prohibits all political speech that is not related to an upcoming public election or to an activity carried out onsite. Barber is wrong.

As we have already discussed, the Act allows any type of noncommercial speech (including political and ideological speech) in industrial and commercial areas. The Act simply limits noncommercial speech in non-industrial and noncommercial areas to that which relates to an on-premise activity or to an upcoming public election. The Act similarly limits commercial speech in those areas to onsite activities. Moreover, as we have also discussed, those limitations under the Act apply only along the interstate and primary highway systems and not elsewhere.

In *Taxpayers for Vincent,* the Supreme Court upheld a city ordinance that prohibited posting signs on public property.[102] A group that placed political campaign signs on utility poles challenged the ordinance.[103] The Court held that the ordinance was a valid time, place, and manner restriction that was narrowly tailored to address the city's legitimate interest in eliminating visual clutter.[104] Noting that "it is the tangible medium of expressing the message that has the adverse impact on the appearance of the landscape," the Supreme Court held that the ordinance was narrowly tailored because it "responds precisely to the substantive problem which legitimately concerns the City. [It] curtails no more speech than necessary to accomplish its purpose."[105]

Like the ordinance in *Taxpayers for Vincent,* the Texas Act precisely addresses the State's concerns with preserving scenic beauty and promoting public safety along interstate and federally-funded state highways. The Texas Act goes no further than necessary to serve those significant interests. The Act contains exemptions to accommodate as much speech as possible and still accomplish the goals of preserving the landscape and promoting travel safety. The Act is therefore sufficiently narrowly

99.  *Id.* at 428, 113 S.Ct. 1505.

100.  *City of Renton,* 475 U.S. at 47, 106 S.Ct. 925; *Clark,* 468 U.S. at 293, 104 S.Ct. 3065; *Heffron,* 452 U.S. at 647–48, 101 S.Ct. 2559.

101.  *See Taxpayers for Vincent,* 466 U.S. at 805, 104 S.Ct. 2118; *Metromedia, Inc.,* 453 U.S. at 509, 101 S.Ct. 2882; *Burns v. Barrett,* 212 Conn. 176, 561 A.2d 1378, 1382 (1989).

102.  466 U.S. at 791, 104 S.Ct. 2118.

103.  *Id.* at 792–93, 104 S.Ct. 2118.

104.  *Id.* at 808–10, 104 S.Ct. 2118.

105.  *Id.* at 810, 104 S.Ct. 2118.

tailored to serve a substantial state interest.

To determine whether the Act constitutes a valid time, place, and manner restriction, however, we must also decide whether the Act leaves Barber with adequate alternative avenues for communication. Relying on *City of Ladue v. Gilleo*,[106] Barber contends that the Act leaves him with no adequate substitute for the suppressed speech. The court of appeals agreed, stating:

> The sign on his property identifies Barber as the speaker. Erecting a sign on property he owns is comparatively cheap and convenient. It is probably the best means, and perhaps the only means, of reaching his intended audience—drivers on Interstate 20. The Act would only permit a comparable billboard in a commercial or industrial area, far from Barber's property. Other possible alternatives—hand-held signs, letters, handbills, flyers, telephone calls, newspaper advertisements, bumper stickers, speeches, and neighborhood or community meetings—would be more expensive, less convenient, and poorly suited to reaching his intended audience, which is, by its nature, constantly changing.[107]

We disagree. Barber contends that the billboard identifies him as the speaker, because it is on his property in a rural area where everyone knows each other. At the same time, however, Barber argues that his targeted audience are those drivers on Interstate 20, passing by his property. Many of those drivers necessarily have no connection to Mitchell County, Texas, and would not know Barber, even if they called the telephone number on his billboard. Moreover, Barber does not reside on the property where his billboard was located, and that property is undeveloped land with no activities onsite. While a few local people may know that Barber owns that property, placing his billboard there does not add communicative value to his message for his targeted audience. Contrary to the dissent's views, we conclude that the special concerns the Supreme Court noted in *City of Ladue* about prohibiting an individual from displaying signs in the yards or windows of their homes do not apply here.

The dissent asserts that rural property owners that do not live on their property would be permitted to display a sign saying, "Watermelons for sale" if they erected a fruit stand on the property, but they would not be permitted to display a sign expressing their political views.[108] Thus, the dissent's example implicitly concedes our point by acknowledging that the sign "Watermelons for sale" would not be permitted on the property if no activity relating to that sign was conducted there. As well, the dissent must concede that rural property owners could display a sign expressing a political view if some activity was conducted on the property relating to the sign.

Further, in *City of Ladue*, the ordinance banned all signs like the one Gilleo wanted to display within city limits. In contrast, Barber admits that a sign identical to his could be placed in an industrial or commercial area. Although Barber asserts that he cannot afford to rent space for such a sign, we are again persuaded by the Sixth Circuit's analysis in *Wheeler* that this fact does not necessarily render alternative channels of communication inade-

**106.** 512 U.S. at 43, 114 S.Ct. 2038.

**107.** 49 S.W.3d at 25.

**108.** 111 S.W.3d at 112.

quate.[109] In concluding that the Kentucky Billboard Act left open ample alternative channels for communication, the Sixth Circuit stated:

> [T]he Billboard Act and regulations leave open ample alternatives for communication of non-commercial and commercial messages. The prohibition against off-premises signs in the Billboard Act and regulations does not apply in areas zoned commercial or industrial prior to September 21, 1959. Signs unrelated to an on-premises activity are permitted in urban areas provided that the sign is located more than 660 feet from the interstate highway. Non-commercial and commercial messages are permitted anywhere provided that an activity relating to the message is conducted on the premises. Finally, the restrictions do not regulate the erection or maintenance of signs other than in areas near interstate or federal-aid primary highways.... Although the cost of erecting a sign may be greater in unprotected areas, the first amendment "requires only that [Kentucky] refrain from effectively denying [appellees] a reasonable opportunity to [erect a sign within Kentucky]." ... The Billboard Act and regulations do not effectively deny appellees a reasonable opportunity to erect a sign with a religious or political message.[110]

Here too, the Texas Act does not effectively deny Barber a reasonable opportunity to convey his message to drivers along Interstate 20. Although the court of appeals stated that areas where he could post his message are far away from Barber's property, we find nothing in the record to support that conclusion. Moreover, although Barber contends that his message needs to be displayed on his property because that is where he allegedly witnessed constitutional violations, there also is nothing in the record to support that assertion.

Finally, Barber suggests that many other roadside signs in Mitchell County did not comply with the Act for years and that this demonstrates the Act was used in this case to suppress an unpopular message rather than to promote traffic safety or aesthetics. But Barber concedes that his billboard is not permitted under the Act. And Barber does not argue or cite any authority to establish the elements of a selective enforcement claim against TxDOT. We therefore do not address that question.

We conclude that the Texas Act is content neutral and constitutes a valid time, place, and manner restriction. It accordingly does not violate Barber's First Amendment rights. Because of this conclusion, we do not address TxDOT's other arguments that the court of appeals' judgment should be reversed.

## B. The Texas Constitution's Article I, Section 8

Finally, we must consider whether the Act is unconstitutional under the Texas Constitution. Although Barber raised this issue in the court of appeals, that court did not resolve the question because it concluded that the Act violated Barber's federal constitutional rights. He raises that same issue here. Because we have concluded that the Act does not violate Barber's First Amendment rights, we address whether the Act violates Barber's rights under the Texas Constitution.

The Texas Constitution provides, in relevant part:

---

**109.** 822 F.2d at 596.

**110.** *Id.* (citations omitted).

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.... [111]

In *Operation Rescue–National v. Planned Parenthood of Houston & Southeast Texas, Inc.*, this Court held:

It is possible that Article I, Section 8 may be more protective of speech in some instances than the First Amendment, ... but if it is, it must be because of the text, history, and purpose of the provision, not just simply *because*. Starting from the premise that the state constitutional provision *must* be more protective than its federal counterpart illegitimizes any effort to determine state constitutional standards. To define the protections of Article I, Section 8 simply as one notch above First Amendment protections is to deny state constitutional guarantees any principled moorings whatever. We reject this approach. [112]

And in *Ex Parte Tucci*, Chief Justice Phillips explored in his concurring opinion the history and adoption of Article I, section 8. [113] He concluded that when there is no prior restraint, "nothing in the language or purpose of [section 8] authorizes us to abandon the notion of accommodating competing interests ... or even to afford greater weight in the balancing of interests to free expression than we would under the First Amendment...." [114]

▆▆ Here, Barber has not articulated any reasons based on the text, history, and purpose of Article I, section 8 to show that

its protection of noncommercial speech is broader than that provided by the First Amendment under the circumstances presented. Accordingly, we decline to hold that the Texas Constitution affords Barber greater rights than does the First Amendment.

## IV. CONCLUSION

The Texas Highway Beautification Act, as applied to Barber's billboard, does not impermissibly infringe upon Barber's free speech rights under the United States Constitution. The Act is content neutral and constitutes a valid time, place, and manner restriction. Nor has Barber shown that the Texas Constitution provides him greater protection than the federal constitution. We accordingly reverse the court of appeals' judgment and render judgment for TxDOT.

Justice OWEN filed a dissenting opinion, in which Justice HECHT and Justice SMITH joined.

Justice OWEN, dissenting.

I respectfully dissent. I cannot readily distinguish the statute at issue in this case from the city ordinance at issue in *City of Ladue v. Gilleo*.[1] The reasoning in that and other decisions of the United States Supreme Court that have dealt with restrictions on signage lead me to conclude that the Texas Highway Beautification Act is infirm.

### I

The Court presumes that the sign at issue is not commercial speech, and the

---

**111.** Tex. Const. art. I, sec. 8.

**112.** 975 S.W.2d 546, 559 (Tex.1998) (footnote omitted) (emphasis in original).

**113.** 859 S.W.2d 1, 16 (Tex.1993) (plurality opinion) (Phillips, C.J., concurring).

**114.** *Id.* at 32.

**1.** 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

Texas Department of Transportation does not contend otherwise. I therefore presume that the speech at issue is noncommercial.

I question, though, whether the restrictions on speech that the Act imposes are content neutral. The Act permits on-site commercial speech and some noncommercial speech, but prohibits an owner of property from expressing a broad range of noncommercial speech. Neither the legislative history nor the record in this case suggests that the secondary effects of signs like Barber's distinguish them from speech that is permissible under the Act.

On rural property, the Act bans "outdoor advertising," which includes signs "designed, intended, or used to advertise or inform if any part of the advertising or information is visible from the main-traveled way of the interstate or primary system."[2] There are a number of exceptions to this ban, including a broad exemption for "outdoor advertising solely for activities conducted on the property on which it is located."[3] Other exceptions permit directional advertising for a natural wonder or scenic or historic attraction, signs indicating that the property is for sale or lease, signs that have the purpose of protecting life or property, historical markers,[4] and election signs for ninety days preceding an election and ten days thereafter.[5]

In *City of Cincinnati v. Discovery Network, Inc.*,[6] a city was "[m]otivated by its interest in the safety and attractive appearance of its streets and sidewalks" to ban commercial publications on freestanding newsracks located on public property.[7] Other newsracks containing newspapers were permitted. Two distributors of commercial publications challenged the ordinance. One of them, Discovery Network, had 38 newsracks through which about one-third of its magazines were distributed.[8] The magazines promoted adult educational, recreational, and social programs offered by Discovery Network, along with some information about current events of general interest.[9] The other distributor, Harmon Publishing, had 24 newsracks through which about 15% of its magazines were distributed.[10] These magazines contained real estate listings and photographs of residential property and some information about interest rates and other real estate matters.[11] Because the banned publications were commercial speech, the Court held that the City's burden was at least [12] "to establish a 'reasonable fit' between its legitimate interests in safety and esthetics and its choice of a limited and selective prohibition of newsracks as the means chosen to serve those interests."[13] The City failed to meet this burden.

The Supreme Court's rationale in *Discovery Network* is instructive. The City's failure "to address its recently developed

---

2. TEX. TRANSP. CODE § 391.001(10).

3. *Id.* § 391.031(b).

4. *Id.*

5. *Id.* § 391.005.

6. 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

7. *Id.* at 412, 113 S.Ct. 1505.

8. *Id.*

9. *Id.*

10. *Id.* at 413, 113 S.Ct. 1505.

11. *Id.* at 412–13, 113 S.Ct. 1505.

12. *Id.* at 416 n. 11, 113 S.Ct. 1505 (stating that the Court need not decide whether the City's policy should be subjected to more exacting review).

13. *Id.* at 416, 113 S.Ct. 1505.

concern about newsracks by regulating their size, shape, appearance, or number indicates that it has not 'carefully calculated' the costs and benefits associated with the burden on speech imposed by its prohibition." [14] The Court characterized "the removal of 62 newsracks while about 1,500–2,000 remain[ed] in place" as " 'minute' " and " 'paltry,' " indicating the lack of " 'fit' " between the City's goal and its method.[15]

The Supreme Court said the City's basis for discrimination had not been justified: "We accept the validity of the city's proposition, but consider it an insufficient justification for the discrimination against respondents' use of newsracks that are no more harmful than the permitted newsracks, and have only a minimal impact on the overall number of newsracks on the city's sidewalks." [16] The Court continued:

> Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests.[17]

In the case before us today, I do not see how Barber's sign is any more harmful than the signs that are permitted by the Texas Act.

With regard to whether the Texas Act is content neutral, the United States Supreme Court said in *Discovery Network* that "government may impose reasonable restrictions on the time, place, or manner of engaging in protected speech provided that they are adequately justified ' "without reference to the content of the regulated speech." ' " [18] The Supreme Court held that the restrictions in *Discovery Network* were not content neutral. The City had "enacted a sweeping ban on the use of newsracks that distribute 'commercial handbills,' but not 'newspapers.' " [19] Accordingly, "whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.' " [20] The same is true of the Texas Act. Whether a sign is prohibited can only be determined by examining its content.

The secondary effects attributable to the newsracks at issue in *Discovery Network* did not distinguish them from permitted newsracks. The Supreme Court said: "In contrast to the speech at issue in *Renton,* there are no secondary effects attributable to respondent publishers' newsracks that distinguish them from the newsracks Cincinnati permits to remain on its sidewalks." [21] The secondary effects of noncommercial speech that is banned by the Texas Act are no greater or different than those of the speech that is permitted.

**14.** *Id.* at 417, 113 S.Ct. 1505.

**15.** *Id.* at 418, 113 S.Ct. 1505.

**16.** *Id.*

**17.** *Id.* at 424, 113 S.Ct. 1505 (emphasis in original).

**18.** *Id.* at 428, 113 S.Ct. 1505 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Cmty. for Creative Non–Violence,* 468

U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984))).

**19.** *Id.* at 429, 113 S.Ct. 1505.

**20.** *Id.*

**21.** *Id.* at 430, 113 S.Ct. 1505 (citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)).

The ordinance in *Discovery Network* was neither content neutral nor narrowly tailored.[22] The Supreme Court held that "regardless of whether or not it leaves open ample alternative channels of communication, it cannot be justified as a legitimate time, place, or manner restriction...."[23] And "because the ban is predicated on the content of the publications distributed by the subject newsracks, it is not a valid time, place, or manner restriction on protected speech."[24] The Texas Act, like the *Discovery Network* ordinance, is neither content neutral nor narrowly tailored, and therefore is not a valid time, place, or manner restriction on protected speech.

This Court incorrectly analyzes the reach of the Texas Act's ban in attempting to distinguish *Discovery Network*. The Court says that the Texas Act permits all commercial and noncommercial speech in rural areas as long as "the speech relates to an activity on the premises."[25] But the Act looks at the content of speech to determine whether signage that is unrelated to on-site activities is permitted. The Act permits "directional or other official outdoor advertising ... pertaining to a natural wonder or a scenic or historic attraction."[26] This type of signage is not required to be on-site. Nor are election signs required to have anything to do with on-site activities. But election signs are permitted.[27]

This Court fails to apply the "commonsense" approach that *Discovery Network* applied in determining whether a ban on speech is content based. The ban imposed by the Texas Act is content based "by any commonsense understanding of the term"[28] because the content of speech must be examined to determine whether it relates to on-site activities or is otherwise permissible under the Act. Its content determines whether it is permitted or prohibited.

The Supreme Court also said in *Discovery Network*: "Cincinnati has enacted a sweeping ban that bars from its sidewalks a whole class of constitutionally protected speech."[29] The Texas Act contains a sweeping ban of *all* political speech, unless it relates to on-site activities or is contained in an election sign that is restricted by size and the dates on which it may be displayed. The Texas Act sweeps too broadly.

## II

Even if the Texas Act were content neutral, the rationale of the United States Supreme Court in *City of Ladue*[30] leads me to conclude that the Texas Act does not pass constitutional muster. In *Ladue*, the Supreme Court assumed without deciding that the restrictions on speech in that case were not content based.[31] The Court nevertheless struck down the ordinance.[32] Applying the rationale articulated by a unanimous Court in *City of Ladue*, with JUSTICE O'CONNOR concurring only to raise questions about whether the Court should

22. *Id.*

23. *Id.*

24. *Id.*

25. 111 S.W.3d at 99.

26. TEX. TRANSP. CODE § 391.031(b).

27. *Id.* § 391.005.

28. 507 U.S. at 429, 113 S.Ct. 1505.

29. *Id.* at 430, 113 S.Ct. 1505.

30. 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

31. *Id.* at 53, 114 S.Ct. 2038.

32. *Id.* at 58, 114 S.Ct. 2038.

have assumed that the ordinance was not content based,[33] I am not prepared to say that the facts in this case distinguish it from *City of Ladue.*

In *City of Ladue*, the owner of a residence displayed an 8–inch by 11–inch sign in a window of her residence that said, "Say No to War in the Persian Gulf, Call Congress Now." [34] The sign at issue in the case before us today is larger than the sign at issue in *City of Ladue* and was erected on private property that was not the residence of the owner. But I cannot read the United States Supreme Court's decision so narrowly as to turn entirely on the size of the sign, or more importantly, whether the owner of private property resided on that property.

The stated purpose of the ordinance at issue in *City of Ladue* is similar to one of the purposes of the Texas Act at issue today. In *Ladue*, the Court noted:

> Thus, according to the Declaration of Findings, Policies, Interests, and Purposes supporting the ordinance, the permitted signs, unlike the prohibited signs, are unlikely to contribute to the dangers of "unlimited proliferation" associated with categories of signs that are not inherently limited in number.[35]

The Court in *Ladue* said that the exemptions in the ordinance at issue in that case shed light on whether too much speech was prohibited and diminished the credibility of the government's rationale for restricting some types of speech but not others:

> Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale for restricting speech in the first place.... In this case, at the very least, the exemptions from Ladue's ordinance demonstrate that Ladue has concluded that the interest in allowing certain messages to be conveyed by means of residential signs outweighs the City's esthetic interest in eliminating outdoor signs. Ladue has not imposed a flat ban on signs because it has determined that at least some of them are too vital to be banned.[36]

The credibility of the Texas Act is diminished by the exemptions that it permits. The exemptions in *City of Ladue* were not enough, however, standing alone, to persuade the Supreme Court that the prohibition at issue was unconstitutional. The Court said that it would first "ask whether Ladue may properly *prohibit* [the property owner] from displaying her sign, and then, only if necessary, consider the separate question whether it was improper for the City simultaneously to *permit* certain other signs." [37]

The Supreme Court noted that Ladue's ordinance, like the Texas Act, "covers even such absolutely pivotal speech as a sign protesting an imminent governmental decision to go to war." [38] And, the Ladue ordinance, like the Texas Act, foreclosed a "venerable means" of communication, which is displaying a sign on private property expressing the owner's political views:

> Ladue has almost completely foreclosed a venerable means of communication

---

33. *Id.* at 59, 114 S.Ct. 2038.

34. *Id.* at 45, 114 S.Ct. 2038.

35. *Id.* at 52, 114 S.Ct. 2038.

36. *Id.* at 52–53, 114 S.Ct. 2038.

37. *Id.* at 53, 114 S.Ct. 2038 (emphasis in original).

38. *Id.* at 54, 114 S.Ct. 2038.

that is both unique and important. It has totally foreclosed that medium to political, religious, or personal messages. Signs that react to a local happening or express a view on a controversial issue both reflect and animate change in the life of a community. Often placed on lawns or in windows, residential signs play an important part in political campaigns, during which they are displayed to signal the resident's support for particular candidates, parties, or causes. They may not afford the same opportunities for conveying complex ideas as do other media, but residential signs have long been an important and distinct medium of expression.[39]

The Supreme Court then noted that "[o]ur prior decisions have voiced particular concern with laws that foreclose an entire medium of expression," and that "by eliminating a common means of speaking, such measures can suppress too much speech."[40] Placing a sign on one's own property is a common means of speaking, even if the property is not the owner's residence.

The City of Ladue argued, like the State argues in this case, that it was merely regulating the time, place and manner of speech, and the property owner remained free to communicate by other means.[41] The Supreme Court was unpersuaded: "[W]e are not persuaded that adequate substitutes exist for the important medium of speech that Ladue has closed off."[42] Similarly, the Supreme Court said in *Discovery Network* that "even if we

assume, arguendo, that the city might entirely prohibit the use of newsracks on public property, as long as this avenue of communication remains open, these devices continue to play a significant role in the dissemination of protected speech."[43] Signs on private property expressing the owner's viewpoint play a significant role in the dissemination of protected speech.

In *City of Ladue*, the Supreme Court discussed the unique impact that a small residential sign could have and noted that residential signs are "an unusually cheap and convenient form of communication."[44] But the Court also recognized that even for those of means, the cost of taking out a newspaper advertisement or handing out leaflets "may make the difference between participating and not participating in some public debate."[45] The Supreme Court said:

> Even for the affluent, the added costs in money or time of taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a handheld sign may make the difference between participating and not participating in some public debate. Furthermore, a person who puts up a sign at her residence often intends to reach *neighbors*, an audience that could not be reached nearly as well by other means.[46]

In the case before us today, the Court distinguishes *City of Ladue* in part on the basis that Barber was attempting to reach

39. *Id.* at 54–55, 114 S.Ct. 2038.

40. *Id.* at 55, 114 S.Ct. 2038.

41. *Id.* at 56, 114 S.Ct. 2038.

42. *Id.*

43. 507 U.S. 410, 427–28, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

44. *City of Ladue*, 512 U.S. at 57, 114 S.Ct. 2038.

45. *Id.*

46. *Id.* (emphasis in original).

those traveling on a highway rather than residents in a neighborhood.[47] But I cannot read the decision in *Ladue* so narrowly. Barber could not express his views about the searches occurring on the highway "nearly as well by other means."[48] As the United States Supreme Court said: "The elimination of a cheap and handy medium of expression is especially apt to deter *individuals* from communicating their views to the public, for unlike businesses (and even political organizations) individuals generally realize few tangible benefits from such communication."[49]

Barber is an attorney, and the content of his sign could arguably lead clients who had been subjected to a search to retain him. But again, the State has not contended that the speech at issue was commercial, and if Barber's sign had contained other speech, such as: "Protect a woman's right to choose, make your voice heard," or: "A child is created at conception," or encouraging a visit to a place of worship of a particular faith or denomination, such a sign would have been unlawful under the Act.

The United States Supreme Court did emphasize in *City of Ladue* that "[a] special respect for individual liberty in the home has long been a part of our culture and our law," and that "[m]ost Americans would be understandably dismayed, given that tradition, to learn that it was illegal to display from their window an 8–inch by 11–inch sign expressing their political views."[50] But I think that owners of rural property, even if they do not live on the

property, would be dismayed to learn that they cannot place even a single sign on that property expressing their political views, although they would be permitted to display a sign that said, "Watermelons for sale" if they erected a fruit stand on the property. Preserving scenic beauty and promoting public safety are legitimate aims, but the State could have limited the number or density of signs that an owner may display on property abutting highways and achieved the same end. Or the State could have regulated the size of signage, as it has done with election signs that are permitted.[51] Instead, it prohibited a broad range of noncommercial speech while permitting other noncommercial and commercial speech, and during certain times of the year, other political speech. The Texas Act permits some political speech, such as election signs, but broadly bans all other political speech and a broad range of other noncommercial signage, unless it relates to an on-site activity. The distinctions drawn by the Act are not justified by its laudable purposes.

Accordingly, I must dissent.

---

**47.** 111 S.W.3d at 98.

**48.** *City of Ladue,* 512 U.S. at 57, 114 S.Ct. 2038.

**49.** *Id.* at n. 15, 114 S.Ct. 2038 (emphasis in original).

**50.** *Id.* at 58, 114 S.Ct. 2038.

**51.** *See* TEX. TRANSP. CODE § 391.005 (limiting the surface area of election signs to 50 square feet).